## Case No. 13,975.

### THOMPSON v. SCOTT.

[4 Dill. 508; 22 Int. Rev. Rec. 376; 3 Cent. Law J. 737; 14 Alb. Law J. 400.] [1]

Circuit Court. D. Iowa.   Oct. Term, 1876.

CONTEMPT — ACTIONS AGAINST RECEIVERS — How PROCEEDED WITH.

1. A person who brings an action in one court, against a receiver appointed by another court,

[1] [Reported by Hon. John F. Dillon, Circuit Judge. and here reprinted by permission. 14 Alb. Law J. 400, contains only a partial report.]

without the consent of·the court who appointed the ·receiver, is guilty of a contempt of the latter court: and this is so although such action may not result in disturbing the possession of the receiver. This doctrine applies with peculiar force to cases where suits are brought in the state courts against receivers appointed by the federal courts, in suits brought by citizens of other states to foreclose railway mortgages. The doctrine adopted by the supreme court of Iowa in Allen v Central R. Co., 42 Iowa, 683. and by the supreme court of Wisconsin in Kinney v. Crocker, 18 Wis. 75, denied.

[Cited in Kennedy v. Indianapolis. C. & L. R. Co.. 3 Fed. 100.   Distinguished in The Willamette Valley. 62 Fed. 305.   Cited in Texas & P. Ry. Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 907: Otis v. Gross. 96 Ill. 614; Walker v. Geo. Taylor Commission Co. (Ark.) 18 S. W. 1057   Cited in brief in Town of Roxbury v. Central Vt. R. Co., 60 Vt. 130, 14 Atl. 92.]

2. In such cases. the proper practice is for the person having a demand against the funds in the hands of the receiver, to bring his demand into the court appointing the receiver, and the court will direct him to be examined, pro interesse suo. before the master, and if, upon auditing his claim, the court finds it to be a just one, it will direct the receiver to pay it without litigation. but if the court finds the claim to be a doubtful one, it will give the claimant leave ·to prosecute it before some competent court—consulting herein the convenience of parties and exercising a judicial discretion.

[Cited in Re Cunningham, Case No. 3,478.]

At law.

Grant & Smith, for receiver.
L. O. Hatch, for respondent.

LOVE, District Judge. The respondent is before the court by virtue of an order against him to show cause why he should not be attached for contempt. The alleged contempt is that, without obtaining leave, he commenced a suit in the circuit court of Clayton county, Iowa, against the complainant, a receiver appointed by this court.

The question before us to be decided is, whether or not a party may, of right, sue in a state court a receiver appointed by this court. without first coming here for leave to do so. The counsel for the respondent maintains the affirmative of this proposition, and relies upon the following authorities: Page v. Smith, 99 Mass. 395; Kinney v. Crocker, 18 Wis. 75; Hills v. Parker, 111 Mass. 508; Camp v. Barney, 11 N. Y. Sup. Ct. [4 Hun] 373; and especially upon the recent case of Allen v. Central R. Co., 42 Iowa, 683, decided by the supreme court of Iowa.

The doctrine of the Wisconsin decision, quoted and approved. by the supreme court of Iowa in Allen v. Central R. Co., is expressed in these words: "There can be no room to question this conclusion, that in all cases where there is no attempt to interfere with actual possession of property, ·which the receiver holds under the order of a court of chancery, but only an attempt to obtain judgment at law, etc., it is not necessary to obtain leave of the court."

That this doctrine is, however, against

the weight of authority in both England and America, is beyond doubt. Mr. High, the author of the work on "Receivers," in a late article in the Southern Law Review (October, 1876), in which he attempts to maintain the distinction taken by the Wisconsin court between actions which affect the actual possession of the receiver, and suits which merely aim to obtain an adjudication of the party's rights, acknowledges that the weight of authority is against the doctrine. He says: "It is undoubtedly true that the present weight of authority is adverse to the exercise of any right of action against a receiver, other than that from which he derives his appointment and to which alone he is amenable. Deriving their notions of the sanctity of the receiver's office and functions from the English chancery, courts of equity in this country have almost uniformly denied any right of action against their receivers, unless leave of the court be first had for that purpose." The learned writer cites, in support of this statement, a large number of authorities, both English and American.

But whatever may be the rule for other courts, we think there can be no doubt as to the practice by which we are to be governed. We find the law laid down by the supreme court of the United States, in Wiswall v. Sampson, 14 How. [55 U. S.] 65, 66, and 67, as follows: "When a receiver has been appointed, his possession is that of the court, and any attempt to disturb it, without the leave of the court first obtained, will be a contempt on the part of the person making it. This was held in Angel v. Smith, 9 Ves. 335, both with respect to receivers and sequestrators. When, therefore, a party is prejudiced by having a receiver put in his way, the course has either been to give him leave to bring an ejectment, or to permit him to be examined pro interesse suo. Brooks v. Greathed, 1 Jac. & W. 176; 3 Daniell, Ch. Prac. 1984. And the doctrine that a receiver is not to be disturbed extends even to cases in which he has been appointed expressly, without prejudice to the rights of persons having prior legal or equitable interests. And the individuals having such prior interests must, if they desire to avail themselves of them, apply to the court either for liberty to bring ejectment, or to be examined pro interesse suo, and this, though their right to the possession is clear. 1 Cox, 422; 6 Ves. 287. The proper course to be pursued, says Mr. Daniell, in his valuable treatise on pleading and practice in chancery, by any person who claims title to an estate or other property sequestered, whether by mortgage or judgment, lease or otherwise, or who has a title paramount to the sequestration, is to apply to the court to direct the plaintiff to exhibit interrogatories before one of the masters, in order that the party applying may be examined as to his title to the estate.

An examination of this sort is called an examination pro interesse suo, and an order for such examination may be obtained by a party interested, as well when the property consists of goods and chattels or personalty, as when it is real estate. And the mode of proceeding is the same in the case of the receiver. 6 Ves. 287; 9 Ves. 336; 1 Jac. & W. 178; 3 Daniell, Ch. Prac. 1984. A party, therefore, holding a judgment which is a prior lien upon the property, the same as a mortgage, if desirous of enforcing it against the estate after it has been taken into the care and custody of the court, to abide the final determination of the litigation, and pending that litigation, must first obtain leave of the court for this purpose. The court will direct a master to inquire into the circumstances, whether it is an existing unsatisfied demand, or as to the priority of the lien, etc., and take care that the fund be applied accordingly. It has been argued that a sale of the premises on execution and purchase occasioned no interference with the possession of the receiver, and hence no contempt of the authority of the court, and that the sale, therefore, in such a case, should be upheld. But, conceding the proceedings did not disturb the possession of the receiver, the argument does not meet the objection. The property is a fund in court, to abide the event of the litigation, and to be applied to the payment of the judgment creditor, who has filed his bill to remove impediments in the way of his execution. If he has succeeded in establishing his right to the application of any portion of the fund, it is the duty of the court to see that such application is made. And in order to effect this, the court must administer it independently of any rights acquired by third persons pending the litigation. Otherwise the whole fund may have passed out of its hands before the final decree, and the litigation become fruitless. As we have already said, it is sufficient for the disposition of this case, to hold that while the estate is in the custody of the court, as a fund to abide the result of a suit pending, no sale of the property can take place, either on execution or otherwise, without the leave of the court for that purpose. And upon this ground we hold that the sale by the marshal, on the two judgments, was illegal and void, and passed no title to the purchaser. This proceeding was explained by Lord Eldon, in Angel v. Smith, 9 Ves. 335, speaking of the rule in respect to sequestrators, and which he held was equally applicable in the case of receivers. 'Where sequestrators,' he observed, 'are in possession, under the process of the court, their possession is not to be disturbed, even by an adverse title, without leave, upon the principle that the possession of the sequestrators is the possession of the court, and the court being competent to examine the title, will not permit itself to be made a suitor in a court

of law, but will itself examine the title. And the mode is, by permitting the party to come in to be examined, pro interesse suo; the practice being to go before the master to state his title, and there is the judgment of the master, and afterwards, if necessary, of the court upon it. See, also, 10 Beav. 318; 2 Daniell, Ch. Prac. 1271; 2 Madd. 21; 1 P. Wms. 308.' "

The doctrine of the Wisconsin and Iowa cases is that any party seeking satisfaction out of a fund in the hands of a receiver, may prosecute his claim and have his rights adjudicated in a suit against the receiver, in any court of competent jurisdiction, without the permission of the court from which the receiver derives his appointment, provided the proceeding be such as not to disturb the actual possession of the receiver. If this doctrine be taken in all its latitude, I am not aware of any action at law which may not be thus maintained against a receiver, except replevin and attachment. The action of ejectment, though possessory, does not, in the first instance, touch the actual possession of the property involved. It determines the right of possession, but not until that right is established by judgment, and the court issues its writ of possession, is the actual possession of the defendant touched by the proceeding. Why, then, if the Iowa and Wisconsin doctrine be sound, might not ejectment, as well as trespass and all other actions, except replevin and attachment, be prosecuted against a receiver without any leave of the court of his appointment? And if this can be done, innumerable claims may be set up and established by the judgment of other courts against the judgment of the court holding the fund by the hand of its receiver. Can this be done? Could ejectment, for instance, be thus maintained against a receiver? Certainly not, so far as the federal courts are concerned. Wiswall v. Sampson, 14 How. [55 U. S.] 65.

In my judgment, the doctrine of the Iowa decision contravenes the whole scheme of equity jurisdiction in the matter of appointing receivers, and in the taking of possession, through them, of the property in litigation. The court of equity takes cognizance of a suit against an insolvent company or corporation, and where the danger exists that the litigation may prove fruitless to creditors, by waste or a fraudulent disposition of the property, the court will take it into possession by the appointment of a receiver. The property thus becomes a fund subject to the disposition of the court, and under its exclusive control. The principle that the court which has possession and control of a fund, has the exclusive right to determine all claims and liens asserted against it, is fundamental. Hence, every court of equity in such a case assumes to decide all controversies touching the subject matter of the suit and the fund; to determine the existence and priority of all liens; to adjust and settle all disputed claims; marshal the assets, and finally to distribute the surplus among the general creditors pro rata, upon its own principle of equality among creditors. The very ground and reason of this jurisdiction is the inadequacy of mere legal remedies. But, according to the Iowa decision, there is no reason why any party claiming satisfaction out of the fund, may not, without the consent of the receiver's court, assert his rights in any competent court, provided he does not attempt to disturb the possession of the receiver; and thus may the decision of the claims and controversies involved in the litigation be withdrawn from the court of equity, where they properly belong, and transferred to the courts of law. And the result would be that claims against the fund would be determined, not by the court having jurisdiction of the case and control of the fund, but by other and different tribunals. Judgments would thus be rendered against the receiver—in other words, against the fund; and the court having the fund in its possession would be compelled to treat such judgments as nullities, or recognize and pay them. Before the court of equity could, perhaps, make a final determination of the rights of the parties before it, other courts might render judgments against its receiver to an amount sufficient to absorb the whole fund or property, and the litigation would prove barren of results to the parties in equity. Such judgments against the receiver would be either valid or invalid. If invalid, it follows that suits against the receiver, resulting in such judgments, would be perfectly futile and useless, and for that reason they ought to be stopped by the receiver's court; for certainly such suits would harass and embarrass the receiver, and expose him to the heavy costs of litigation; and, if they resulted in no benefit to the parties prosecuting them, it would be simply idle, if not absurd, to allow such actions to proceed against the receiver. But, doubtless, if the doctrine of the Iowa court be sound, judgments against the receiver would be valid to all intents and purposes, and they must be so treated by all courts in which they should be pleaded. This being the case, what follows? Why, that the court of equity, having control of the fund, would have no alternative but to recognize and pay the judgments and decrees rendered elsewhere against its receiver, and if the fund consisted, in whole or part, of real estate, the judgments against the receiver would become liens upon the property, thus encumbering and casting a cloud upon the title. Under such conditions, the sale of the property, under the decree of the court of equity, to satisfy its judgments, would be hopeless and ineffectual. Thus would the whole purpose of the litigation in equity and of the taking possession of property through the receiver, be utterly defeated. The absurdity of such a result requires no explanation.

The view thus presented applies with re-

doubled force to railroad foreclosure suits in the United States circuit court. The non-resident citizen comes here to set up and enforce the lien of his mortgage, for the very reason that he thinks he would be exposed to injustice in the state courts from local prejudice. But no sooner does he get the railroad property in the hands of a receiver, than that officer, if the doctrine of the Iowa court be sound, is exposed to suits in the state courts upon claims and demands of all kinds, and thus the substantial ends for which the non-resident complainant comes here, is practically defeated. The receiver himself has no beneficial interests in the controversies waged against him in the local courts, and the litigation is, practically, between the non-resident citizen and the citizen of Iowa. Suits may be brought, and judgments innumerable rendered against the receiver, all along the line of a railway, by justices of the peace and other local courts. These judgments may, if valid, be made liens upon the railway property, and the federal court must reject them as nullities, or recognize and pay them out of the mortgaged property. If the federal court must recognize and, pay them, the state courts thus take from the former court the power of determining, first, what debt shall be paid out of the funds in its hands; second, what claims shall be made liens upon the mortgaged property. Thus would the federal court sit merely to register and pay the judgments and decrees of the state courts.

But what if the judgments and decrees of the state courts are to be treated here as nullities, and so disregarded? Then why should the plaintiff in the state courts be allowed to prosecute suits against the receiver? Cui bono? The plaintiff in the state court does not sue the receiver in his own right, but in his official capacity as receiver. He, in fact, sues the fund through the receiver who represents it. He cannot levy execution of his judgment upon the receiver's individual property. Unless he can obtain satisfaction of his judgment out of the fund in this court, his suit and judgment against the receiver are worthless. Then why should he be permitted to prosecute such suits? Why not require him to come at once, and in the first instance, into the only court which can give him any real satisfaction; the only court which has in its possession any property from which he can obtain payment of his claim?

But, assuming that this court would not sit here merely to register the judgments and decrees of the state courts, and to pay them, without inquiry, out of the trust fund in its possession, it may be asked what harm will result to the non-resident creditors, from permitting suits to proceed against receivers? I answer that such judgments, even if we repudiate them and refuse to pay them, would cast a cloud upon our title and seriously affect a sale of the railroad property.

When the receivership is at an end and the property no longer under our control, but in the hands of a purchaser at the foreclosure sale, I know of no reason why the state court might not proceed to enforce their judgment by execution and sale. At all events, the apprehension of such a result would cast such a cloud upon the title as effectually to defeat an advantageous sale, and this furnishes an all-sufficient reason why we should, by injunction, and by process of contempt, prevent the prosecution of suits against our receivers.

Again, if any and everybody may sue our receiver without our consent, along the line of the road, innumerable suits may be prosecuted against him, and he may be thus exposed to the costs and expenses of ruinous litigation. Now, he is our officer, and suits would be prosecuted against him as such, and not against him as an individual. We have placed him in the breach and exposed him to a deadly fire. Shall we leave him naked to his enemies? Shall the court abandon him to his fate and compel him to pay the costs and charges of a ruinous litigation out of his own pocket? Or, if the court should authorize him to employ counsel and pay the costs of numberless suits out of the trust fund, what then? Why, it would follow that the fund in our hands might be wasted and squandered in useless and fruitless litigation.

Again, such a course would result in endless multiplicity of suits, which equity abhors. If, instead of prohibiting suits against our receivers, and requiring all parties having claims to come into the suit already pending before us, we allow any and every party so disposed to sue the receivers in the state courts of record, and before the numerous justices of the peace, a vast multiplicity of suits would be the inevitable result. But, on the other hand, let all claimants bring in their demands here, and we will direct them to be examined pro interesse suo before the master, and if, upon auditing them, we find them to be just, we will direct the receiver to allow and pay them, without litigation. If we find the claimant's demand doubtful, we will give him leave to prosecute his claim against the receiver before some competent court. Thus, by the exercise of sound and just discretion, this court may do speedy justice, and avert troublesome and expensive litigation. And such has been the uniform practice. When leave to sue is asked of us, if we find that a suit is necessary, we direct in what forum—consulting herein the convenience of parties, and exercising a judicial discretion.

The argument of the supreme court of Wisconsin, is that the federal court "appoints receivers, who take possession of, and operate, the road. While so operating it, they make thousands, perhaps millions, of legal contracts for the transportation of freights and passengers, etc. Yet, upon the doctrine contended for, all litigation upon these causes of

action, although, in many cases, being only between citizens of this state, would be drawn into the federal courts; and the state courts absolutely divested of jurisdiction, unless the federal courts saw fit first to grant it."

Now, this argument, from inconvenience, it must be admitted, is quite specious; but I cannot see its cogency, since it is admitted that the federal court being in possession of the entire property of the corporation, no execution could be levied without its consent. Of what avail, therefore, would a judgment be against the receiver, without the consent of the federal court? What practical difference can there be between the necessity of obtaining this consent before, and after, judgment? If the suitor comes into the federal court and prosecutes his claim, there is a fund under the control of the court recognizing his claim or giving him judgment, to satisfy his claim or judgment. If, on the contrary, he goes into the state court, he may get a judgment, but there is nothing out of which he can obtain its satisfaction. His judgment is barren of results. Which, then, is the better forum for the claimant to resort to, assuming that both will deal justly with him? Since all suits against the receiver, as such, for claims growing out of his operation of the road, must be against him in that capacity, and must be satisfied, if paid at all, out of the property under the control of the federal court, why should not the suit be brought in the same court, or elsewhere, with its consent?

It must, moreover, be borne in mind that the inconveniences suggested by the supreme court of Wisconsin, are necessarily but temporary, since the possession of the court ceases with the close of the litigation. Unless the respondent shall stipulate to dismiss the suit in the state court, an attachment against him will issue. Ordered accordingly.