<hr/>

## THE WILLAMETTE VALLEY.

GLEESON v. THE WILLAMETTE VALLEY et al. (No. 10,777.) LEVI et al. v. SAME (GARIBALDI, Intervener. No. 10,861). CHANDLER v. SAME. (No. 10,862.) ALLISON et al. v. SAME. (No. 10,866.)

(District Court, N. D. California. June 22, 1894.)

COURTS—CONFLICTING STATE AND FEDERAL JURISDICTION—MARITIME LIENS AGAINST VESSEL IN POSSESSION OF RECEIVER APPOINTED BY STATE COURT.

A steamship, owned by an insolvent corporation, and in possession of a receiver of its property appointed by a state court, was employed by him, under authority of the court, in transporting merchandise and passengers, in connection with the usual business of the corporation, between a port in the state and a port in another state. Held, that the vessel was not exempt, by the rule of comity, as in custodia legis, from maritime liens for liabilities incurred in such other state in the course of such employment, nor from seizure for enforcement of such liens upon libels in a United States district court in that state, without leave of the court appointing the receiver; she having been engaged, when the liens were incurred, as a common carrier in trade and commerce, and the state and federal courts not having co-ordinate or concurrent territorial jurisdiction.

Libels for damages to a passenger, and for supplies, etc. Exceptions to libels, on the ground that the court has no jurisdiction, the vessel being operated by a receiver appointed by the circuit court of the state of Oregon. Exceptions overruled.

John A. McKenna, for libelant P. G. Gleeson.
Wal. J. Tuska, for libelants Jacob Levi, Sr., and others.
W. C. Graves, for intervener, J. Garibaldi.
Andros & Frank, for libelant R. D. Chandler.
W. H. Mahony, for libelants D. E. Allison and J. M. Gray.
Page, Eells & Wheeler, for claimant.

MORROW, District Judge. The libelant Patrick G. Gleeson filed his libel against the steamship Willamette Valley, October 6, 1893, alleging that in the month of August, 1893, the vessel was at the port of Yaquina, in the state of Oregon, destined on a voyage to the port of San Francisco; that the libelant, holding a ticket entitling him to a first-class cabin passage in said vessel from the port of Yaquina to the port of San Francisco, embarked on said vessel, and, upon the exhibition of the said ticket to the master of the vessel and his agents, the libelant was accepted and received as a first-class cabin passenger on board the vessel; that on the following day, after the vessel had sailed from Yaquina, and while she was on the high seas, the master, by himself and his agents, disputed the right of the libelant to be a passenger on board of said vessel, and thereupon excluded him from the cabin of the vessel; that libelant offered to pay the master for a full steerage passage from the port of Yaquina to San Francisco, but the master refused to accept such payment, and excluded him from the cabin and steerage of the vessel, and confined him in the forward part of the vessel, and refused him lodgings, sleeping accommodations, and provisions, whereby he suffered great physical pain and mental distress, for which he claims damages in the sum of $5,000. The usual process and monition of the court having been issued on this libel, the marshal took the vessel into custody, and thereupon she was claimed by the Oregon Pacific Railroad Company, E. W. Hadley, receiver, by D. R. Vaughn, general agent, and a bond given for her release in the sum of $10,000, and the vessel was accordingly released. A plea to the jurisdiction was thereupon interposed by the receiver, in which it was alleged that he was the receiver of the Oregon Pacific Railroad Company and the Willamette Valley & Coast Railroad Company, appointed by the circuit court of the state of Oregon, a court of general jurisdiction, and that the steamship Willamette Valley was the property of said railroad companies, and had come into his possession as such receiver; that the vessel was being operated as part of the trust property turned over to him by the court at the time libelant commenced his action, and that the libelant never obtained permission to libel the vessel from the court having possession and control of the property. The plea was submitted on briefs, and, as the libel did not show that the contract sued upon originated in a jurisdiction foreign to that of the state of Oregon,—that is to say, in San Francisco,— as implied in the argument, the court intimated that the plea to the jurisdiction might be sustained on that ground, whereupon an amended libel was filed, setting forth that the ticket which libelant exhibited and offered to the master of the steamship Willamette

Valley, for the passage from Yaquina to San Francisco, was a round-trip ticket, issued and sold in San Francisco about July 27, 1893, to one Johnson, good for 30 days; that Johnson had been received and accepted on said vessel as a first-class cabin passenger on the voyage from San Francisco to Yaquina, and thereafter Johnson, for a valuable consideration, had sold and assigned the ticket to the libelant for the return voyage to San Francisco. Pending these proceedings in this court, several actions at law were commenced in the superior court of the city and county of San Francisco against the Oregon Pacific Railroad Company, wherein writs of attachment were issued, and, after the vessel had been released from the custody of the marshal, these writs were levied upon the vessel by the sheriff. While these actions were being prosecuted in the state court, other creditors, claiming maritime liens, came into this court, and filed libels for supplies, seamen's wages, etc., aggregating $13,107.41. It is alleged in the libels that the supplies were furnished on the credit of the vessel, and were necessary in each case to enable the vessel to perform the succeeding voyage. Monitions were issued on these libels, and placed in the hands of the marshal; but as the vessel was at that time in the possession of the sheriff, under the writs of attachment issued out of the state court, his custody of the vessel was not disturbed, and the monitions remained in the hands of the marshal unexecuted until April 11, 1894, when the sheriff discharged the vessel from arrest under the attachments, and thereupon the marshal immediately seized the vessel, in obedience to the writs in his hands, and, in default of bond, has since retained her in his custody and possession. It appears that this seizure was made by the marshal after the vessel had been released by the sheriff, and before the receiver had an opportunity to regain possession of her.

The receiver of the Oregon Pacific Railroad Company has interposed exceptions and answers to three of these additional libels filed against the vessel. These exceptions show that the vessel is owned by the Oregon Pacific Railroad Company, a corporation organized under the laws of the state of Oregon; that the vessel is enrolled at Yaquina, in said state; that in consequence of a certain action instituted in the circuit court of the state of Oregon in and for Benton county, against the Oregon Pacific Railroad Company, to obtain a decree of foreclosure of a certain mortgage theretofore made and delivered by the Oregon Pacific Railroad Company to the Farmers' Loan & Trust Company, to secure the bonded indebtedness of said railroad company, a receiver was appointed on or about the 28th of October, 1890, by the above-named state court; that said receiver duly entered into possession of all of the properties of said railroad company, including the steamship Willamette Valley; that the said receiver, in pursuance of his trust and under the orders of said court, conducted the business of said railroad company, transporting merchandise and passengers on said steamship Willamette Valley from said Yaquina to said port of San Francisco, backward and forward; that this receiver was succeeded by another, and this latter by the present receiver, Charles Clark. The exceptions further

state that while the steamship Willamette Valley was in his possession as receiver, and was operated by him under the orders of the court, and subject to the jurisdiction thereof, and as its officer and custodian, the same was taken from his custody and that of his employes, against his will, by the sheriff of the city and county of San Francisco, in several actions at law initiated in the superior court of said city and county of San Francisco, wherein writs of attachment were issued against the Oregon Pacific Railroad Company and levied on said steamship; that thereafter the said steamship was, on motion of plaintiffs in said action, discharged from arrest; that immediately upon the release of. said vessel by said sheriff, on or. about the 11th day of April, 1894, and before the said Charles Clark could retake possession of said vessel, the said marshal of the United States, against the will of said Charles Clark, arrested the said steamship upon process issued out of this court, and now holds the same against the will of said Charles Clark. The exceptions further state that the libels were filed in the several cases, and the property arrested, while the said steamship was in the custody of the circuit court of the state of Oregon, and without the leave of that court having first been had and obtained, as required by law; that the vessel is now detained by said marshal under process in the said several cases, over which cases, in the absence of leave as aforesaid, this court had and has no jurisdiction; that the libels now under consideration were filed to recover a decree for the condemnation and sale of said vessel to pay for certain supplies furnished to said vessel while she was in charge of the receiver appointed in said cause, and while she was being operated by him as part of the said railroad company's property. Issue being joined upon these exceptions and answers, the receiver of the Oregon court contends that the seizure of the marshal was unlawful, because it was an invasion of the possession of the state court, and that this court should now order the vessel released from arrest.

It will be observed that the steamship Willamette Valley is enrolled in the state of Oregon; that, at the time the supplies were furnished for which maritime liens are claimed in the libels now under consideration, the vessel was owned by, and was a part of, the assets of an insolvent corporation, organized and doing business under the laws of the state of Oregon; that the vessel came into the possession of a receiver appointed by a court of that state, who, lawfully and for purposes connected with the discharge of his trust, employed the vessel in transporting merchandise between the port of Yaquina, Or., and the port of San Francisco, in the state of California; that, in the course of such employment, the master or agent of the ship contracted, in the state of California, with citizens of that state, for, and obtained, supplies necessary to such employment of the vessel. The libels are in rem to enforce liens over which a court of admiralty has exclusive and original jurisdiction. The Moses Taylor, 4 Wall. 411; The Hine, Id. 555; The Belfast, 7 Wall. 624; The Lottawanna, 21 Wall. 558, 580; The J. E. Rumbell, 148 U. S. 1, 12, 13 Sup. Ct. 498. The courts of the United States are bound to proceed to judgment, and to afford redress to suitors

before them, in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction. Hyde v. Stone, 20 How. 170, 175; citing Suydam v. Broadnax, 14 Pet. 67, and Bank v. Jolly, 18 How. 503. The jurisdiction of the federal courts cannot be ousted or impaired by any provision of a state law requiring creditors to appear before a state court and present their claims. Chewett v. Moran, 17 Fed. 820; Payne v. Hook, 7 Wall. 425; Railway Co. v. Whitton, 13 Wall. 270, 286; Chicot Co. v. Sherwood, 148 U. S. 529, 534, 13 Sup. Ct. 695; Edwards v. Hill, 8 C. C. A. 233, 59 Fed. 723; The James Roy, 59 Fed. 784.

It is contended, however, in favor of the right of the receiver to have possession of the vessel in this case, that the law of comity supplants these and other well-known principles of jurisdiction, and requires this court to recognize the fact that, in the hands of the receiver, this vessel was in the custody of the law at the time she was seized by the marshal, and therefore, of necessity, subject to the superior right of the state court of Oregon to manage, control, and dispose of the vessel for the purposes of the jurisdiction of that court. This is unquestionably the rule governing the relation of courts of co-ordinate or concurrent jurisdiction, constituted by the authority of distinct governments, as those of a state and of the United States, exercising jurisdiction over the same territory. Taylor v. Carryl, 20 How. 583; Heidritter v. Oilcloth Co., 112 U. S. 294, 305, 5 Sup. Ct. 135; In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785. It was, perhaps, in obedience to this rule, that, while the vessel was lately in the custody of the sheriff of the city and county of San Francisco, libelants did not seek to interfere with his possession, nor did the marshal attempt to disturb him in his custody of the vessel. It was probably conceded by all parties that the vessel was in the custody of the law in this jurisdiction, and could not, while in such custody, be seized by the marshal. The situation would have been the same had the vessel been in the possession of a receiver appointed by a court of this state. But, even in such a case, the creditor, holding a maritime lien, would not be denied his constitutional remedy to proceed against the vessel in rem in the admiralty court. In my judgment, the rule of comity does not require the court to absolutely withdraw its jurisdiction from such a claim. The procedure only is suspended, to avoid a conflict of jurisdiction, while all other legal rights remain. To hold otherwise would have the effect of depriving the citizen of rights guarantied to him by the highest law in the land. It must be remembered that the state court cannot adjudicate the maritime lien without the creditor's assent, nor can it compel such a creditor to come before it, and, what is still more important, it cannot sell the vessel freed from the maritime lien. The James Roy, 59 Fed. 784.

It is contended, however, by counsel for the receiver, that these difficulties do not arise where the debt is contracted while the property is in custodia legis; that in such a case the creditor has only one remedy, and that is to present his claim to the court which has charge of the vessel, the possession of the receiver being that

of the court. This is to claim, in effect, that a maritime lien cannot be created while the vessel is in the custody of the court; but this is not the law, as was clearly shown by the court in the case of The Witch Queen, 3 Sawy. 17, Fed. Cas. No. 17,915. In that case, the libel was filed to recover compensation for services rendered by the libelant as ship keeper while the vessel was in the custody of the marshal, having been seized on a warrant out of the admiralty in various suits therein pending. It was objected that, inasmuch as the vessel was in the custody of the law at the time the alleged contract was made and the services rendered, the owner could not, by any contract which he might make, create any valid lien upon her. The court, commenting on this objection, said that the—

"Consequences of taking property into the custody of the court must be measured by the objects to be attained by it, and there would seem to be no reason to deprive the owner of any right, the exercise of which is consistent with the attainment of the objects of the seizure, and the enforcement, without hindrance or diminution, of the rights growing out of it."

The court then proceeds to show the needless injury that might result to the owner of property denied the right to subject it to a lien while it is in the custody of the court:

"If the owner of property so situated is incapable of making a contract which will give rise to a lien or privilege, he would be equally incapable of making an express hypothecation or mortgage, or even, so far as is perceived, making a valid bill of sale of the vessel; and yet these contracts, subordinated, as they would necessarily be, to the authority of the court and the rights of the suitors before it, he might make without in the least degree interfering with the one or impairing the other. The consequences of the principle contended for might be pernicious in the extreme. The owner would be deprived of all power of disposing of his property, or, on the faith of it, obtaining the means to make necessary repairs, supplies for a new voyage, or funds to enable him to satisfy the very demands for which she had been seized."

The further observations of the court on this point are particularly interesting, as applicable, by analogy, to what appears to be the facts of the case at bar:

"He [the owner] also might use this alleged incapacity as an instrument of fraud; for, by suffering the vessel to remain under attachment in the custody of the marshal's ship keeper (a circumstance which might easily escape observation), he might, while she so remained, cause extensive repairs to be made or supplies furnished, and, upon her release, deny all right of recourse against the vessel, on the pretense that she was in custodia legis when the repairs were made or the supplies furnished."

It was accordingly held that the ship keeper had a lien, although founded on services rendered while the vessel was in the custody of the law, and this lien he could enforce in rem against the vessel after she had been restored to her owner. Manifestly, the doctrine here declared is in the interest of right and justice; and, while it avoids the difficulties of a conflict of jurisdiction, it tends to prevent deception and fraud in a direction where it may be safely and conveniently applied. In the case now before the court, the opportunity for defrauding creditors would be even greater than in the hypothetical case stated, where the supposed custody was that of the marshal. Here the vessel is employed in the business of a

common carrier, by a receiver appointed and operating in a foreign jurisdiction. The very nature of the business in which the vessel is engaged, the apparent authority of the master to contract for supplies, and the absence of the receiver in another jurisdiction, are all circumstances furnishing an opportunity for fraud that condemn, in the strongest terms, the claim of an exemption from a lien in such a case. In my opinion, a lien may be created, in a proper case, even though the property is in the possession of the court. Such a lien is admitted where the property is owned by, and in the possession of, the government. The Siren, 7 Wall. 162. The remedy for its enforcement is another question. Where the property is in the hands of a receiver, a creditor in the same jurisdiction may be sent to the court appointing the receiver for leave to proceed against the property. If leave is granted, the creditor proceeds in the admiralty court to establish his lien and recover his claim. If leave is refused, and the creditor still wishes to rely on his lien, he will be required to wait until the state court has disposed of the property, when he can proceed against it without regard to the proceedings in the state court. The James Roy, supra.

"A claim or lien existing and continuing will be enforced by the courts whenever the property upon which it lies becomes subject to their jurisdiction and control." The Siren, supra.

We come, now, to consider the exemption from seizure claimed on behalf of the possession asserted by a foreign receiver. Does the rule of comity require that application shall be made in such a case to the court appointing the receiver for leave to proceed against the vessel in the enforcement of a maritime lien?

In Booth v. Clark, 17 How. 322, 335, the supreme court of the United States, in speaking of the authority of a receiver in a foreign jurisdiction, said:

"We think that a receiver has never been recognized by a foreign tribunal as an actor in a suit. He is not within that comity which nations have permitted, after the manner of such nations as practice it, in respect to the judgments and decrees of foreign tribunals, for all of them do not permit it in the same manner and to the same extent, to make such comity international or a part of the law of nations."

Again, on page 337:

"The courts of the United States will not subject their citizens to the inconvenience of seeking their dividends abroad when they have the means to satisfy them under their own control. We think that it would prejudice the rights of the citizens of the states to admit a contrary rule."

That the receiver has no legal authority outside the jurisdiction of his appointment is stated with still further precision:

"He has no extraterritorial power of official action; none which the court appointing him can confer, with authority to enable him to go into a foreign jurisdiction to take possession of the debtor's property; none which can give him, upon the principle of comity, a privilege to sue in a foreign court or another jurisdiction, as the judgment creditor himself might have done, where his debtor may be amenable to the tribunal which the creditor may seek. * * * If he seeks to be recognized in another jurisdiction, it is to take the fund there out of it, without such court having any control of his subsequent action in respect to it, and without his having even official power to give

security to the court, the aid of which he seeks, for his faithful conduct and official accountability."

In Ableman v. Booth, 21 How. 506, 524, the supreme court applied this same rule of limitation to the process of a court in the following strong language:

"No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence."

There appears to be abundant reason for applying this doctrine to the case at bar. The receiver was authorized by the circuit court of the state of Oregon to operate the steamship Willamette Valley in her usual employment of carrying passengers and merchandise in connection with the business of the insolvent corporation. Why should a vessel, thus operated, be exempt from the enforcement of maritime liens precisely as they may be enforced against any other vessel engaged in a like enterprise? Certainly, in good conscience and equity, such a vessel, participating in all the benefits derived from commercial pursuits on the high seas and navigable waters in interstate traffic, ought to be subject to the same legal responsibilities imposed on other vessels. A contrary rule would, in effect, constitute a discrimination which would be contrary to the spirit and policy of the admiralty law. Moreover, when the circuit court of the state of Oregon authorized the receiver to operate this vessel, it may be assumed to have been in contemplation of all the attendant and incidental powers, duties, and consequences usual and peculiar to the navigation of vessels, and subject to the principles of the admiralty and maritime law applicable thereto. But let us consider the possession of the receiver under other circumstances. Suppose the steamship Willamette Valley, operated, as she was, by a receiver, had been wrecked at sea or placed in a situation of great peril to herself, cargo, and passengers, and efficient and valuable salvage services had been rendered, and the vessel brought here, as being the nearest harbor of refuge; would the mere fact that the vessel was in the legal possession of a receiver diminish or impair the paramount lien which the admiralty law gives? Would the salvor be compelled to obtain the consent of the Oregon court to proceed in admiralty against the vessel in this jurisdiction? And, if refused, would he be required to present his claim to that court for adjudication, or wait until the affairs of the corporation were wound up and the vessel sold, and then proceed against her wherever found? The mere statement of such questions seems to be their own sufficient answer. To hold that the lien of the salvor would be subject to the doubtful contingencies involved in such a procedure would be to negative the most salutary principles of the admiralty law,—principles devised, not alone for the benefit of the creditor, but for the advantage of the vessel itself; that, in case of peril, she may be saved from destruction; that, owned by an insolvent person or corporation, she may still plow the sea, and not rot by the wall; that, in a foreign port, needing supplies,

she may obtain credit, and, proceeding on her voyage, be an advantage and profit to all concerned. Manifestly, the peculiar, but valuable, provisions of the admiralty law should not be surrendered to a rule of comity unless that rule is clear and unmistakable.

The jurisdiction of the circuit court of the state of Oregon is confined to its territorial limits; its process can extend no further. Ableman v. Booth, supra; Pennoyer v. Neff, 95 U. S. 714. It follows that the power and jurisdiction of its officers, ministerial or otherwise, must also be so limited. In the case at bar the vessel was voluntarily taken by the receiver out of the jurisdiction of the state of Oregon, and into that of another state. Had the vessel been taken out of that state by force or surreptitiously, and against the will of the receiver, a different question might arise; but when he does so voluntarily, and for the purpose of carrying on the business of the insolvent corporation, he loses control over the property, as a matter of official right, in the foreign jurisdiction, and the property, being without the jurisdiction of the court, can no longer be said to be in custodia legis. Such control as he does possess is by virtue of state comity only. Not that the mere fact of his departing from his jurisdiction and entering another operates as an ipso facto relinquishment of all authority and rights over the property. He still possesses the right to preserve, use, and protect the property in so far as may be consistent with the rights of domestic citizens; but the fact that he is a receiver of a foreign jurisdiction does not oust this court of its power to proceed against the property in the hands of such receiver within this jurisdiction. Phelan v. Ganebin, 5 Col. 14. However potent may be the reasons for refusing to disturb the possession of the court holding property in custodia legis in the state where the court is situate, by another court, in the same state, and covering the same territory, such reasons are inapplicable where the property is voluntarily taken from the custody of the court into another territorial jurisdiction. Were the court of the state of Oregon and this court tribunals of co-ordinate jurisdiction, entirely different reasons and principles would apply. But the jurisdiction of the circuit court of the state of Oregon does not extend into the state of California. Therefore nothing that that court can do within its jurisdiction can possibly conflict with this court, nor, vice versa, does anything done by this court, within its proper jurisdiction, conflict with the state court of Oregon. The territorial jurisdiction of each is well defined. The process of each is of no avail in the jurisdiction of the other. In short, they are in no legal sense courts of concurrent or co-ordinate jurisdiction.

The case of Taylor v. Carryl, supra, cited by counsel for claimant, to the point that courts of the United States will not interfere with the possession of the state courts respecting property taken under their process, goes no further than to decide that, where a vessel is in the custody of the sheriff by virtue of a writ of foreign attachment issued by the state court of Pennsylvania, the district court of the United States for the eastern district of Pennsylvania could not take the vessel from the custody of the sheriff, in a suit by a seaman for his wages. The case is not authority, either directly

or by implication, on the proposition that because a court of one
state has taken the property in custodia legis, and, for the purpose
of discharging its trust, sees fit to send the property into another
territorial jurisdiction, the United States court, for such other juris-
diction, cannot entertain suits respecting such res, and, if seizure
be the appropriate proceeding, to authorize its marshal to take the
property into custody.

In Peale v. Phipps, 14 How. 368, the suit was against Peale,
as trustee of the assets of a corporation which had been dissolved,
and its charter declared forfeited. It was sought to compel the
trustee to satisfy the claims of the plaintiffs out of the assets which
he held as trustee. Phipps and others had recovered, in an action
of ejectment against the Agricultural Bank of Mississippi, two
undivided parts of a lot of land in the city of Natchez, state of
Mississippi, and thereafter, under a fi. fa., entered into possession
of the property. Subsequently, under the laws of Mississippi, the
charter of the bank became forfeited, and Peale was appointed trus-
tee. In 1848, Phipps et al. brought an action against Peale, as
trustee, in the eastern district of Louisiana, in the United States cir-
cuit court for that district, to recover rent for the property situated,
as stated above, in Mississippi, and for damages. Peale, having
been served with process in Louisiana, appeared, and interposed
as a defense that, as trustee of the bank, he was not amenable
to any other court than the one which appointed him. The supreme
court, Chief Justice Taney delivering the opinion, held that the
case fell within the principle decided by that court in Vaughn
v. Northup, 15 Pet. 1, in which it was held "that an administrator
could not be sued in another state for a debt due from his intestate,
because he is bound to account for all the assets he receives to the
proper tribunals of the government from which he derives his
authority." It will be perceived that the decision of the supreme
court in that case, however weighty and conclusive it may be
on this court in a case involving an analogous state of facts,
is not applicable to the present case. Here the proceedings are
against the property,—the vessel,—and not against the receiver;
and this property is within the jurisdiction of this court, and not
in the jurisdiction, territorial or otherwise, of the circuit court
of the state of Oregon. In the case just cited, the property—the
real estate concerning which rents and damages were sought to
be obtained from the trustee—was situated in a foreign jurisdic-
tion, and the cause of action had arisen in such jurisdiction. In
the cases at bar, the causes of action now under consideration arose
within the jurisdiction of this court. They are held by citizens
of this state, and are brought for supplies furnished in this state,
and claimed to have been necessary to enable the vessel to be oper-
ated by the receiver, as authorized by the state court of Oregon.
The cases are wholly dissimilar in the material facts.

The case of Vaughn v. Northup, 15 Pet. 1, referred to and fol-
lowed in the case of Peale v. Phipps, supra, involved the right to
sue an administrator appointed by the proper court of Jefferson
county, Ky., in the District of Columbia. The supreme court denied

the jurisdiction of the circuit court of the District of Columbia to entertain such a suit, even though "the assets sought to be distributed were not collected in Kentucky, but were received as a debt due from the government, at the treasury department at Washington, and so constituted local assets within this district." Respecting the extraterritorial powers of an administrator, the court said, speaking through Mr. Justice Story:

"Under these circumstances, the question is broadly presented whether an administrator appointed and deriving his authority from another state is liable to be sued here, in his official character, for assets lawfully received by him, under and by virtue of his original letters of administration. We are of opinion, both upon principle and authority, that he is not. Every grant of administration is strictly confined in its authority and operation to the limits of the territory of the government which grants it, and does not, de jure, extend to other countries. It cannot confer, as a matter of right, any authority to collect assets of the deceased in any other state; and whatever operation is allowed to it beyond the original territory of the grant is a mere matter of comity, which every nation is at liberty to yield or to withhold, according to its own policy and pleasure, with reference to its own institutions and the interests of its own citizens. On the other hand, the administrator is exclusively bound to account for all the assets which he receives, under and in virtue of his administration, to the proper tribunals of the government from which he derives his authority; and the tribunals of other states have no right to interfere with or to control the application of those assets, according to the lex loci. Hence, it has become an established doctrine that the administrator appointed in one state cannot, in his official capacity, sue for any debts due to his intestate in the courts of another state; and that he is not liable to be sued in that capacity in the courts of the latter, by any creditor, for any debts due there by his intestate."

If this case can be deemed applicable to the peculiar equitable principles that appertain to receivers, it would seem to be authority also for the proposition, decisive in the cases at bar, that a receiver has no extraterritorial jurisdiction. But "receivers" and "administrators" are not convertible terms. Though their duties and incidental powers in some respects may be similar, yet they are officers having different functions to perform, and appointed for different purposes; and this is particularly true where, as appears in the case at bar, the receiver was empowered by the foreign court to carry on the business of the insolvent corporation, and, in doing this, to take the property—the vessel—out of the jurisdiction of the court, and contract debts and obligations respecting it, of which debts and obligations, from their maritime nature, this court, as a court of admiralty, has exclusive and original jurisdiction, and where to deny admission to such jurisdiction to citizens of this state in whose favor such debts and obligations have been incurred would be to seriously prejudice their rights by denying them their ordinary and proper remedies. Under any aspect of the Vaughn v. Northup case, it is not applicable to the facts of the cases at bar. Further, it must be remembered that these actions, and others of a similar character, against the vessel, are not brought against the receiver personally, but against the property itself; not against the receiver for some personal liability charged against him, but against the vessel for a liability created by the admiralty law.

The case of Crapo v. Kelly, 16 Wall. 610, involves a question of title solely,—as to whether the sheriff of New York, or the assignee of the owner in Massachusetts, had the superior right to a vessel, she being, at the time of the assignment, on the high seas, and without the jurisdiction of either the state of Massachusetts or the state of New York. The New York court held that the vessel was liable to the creditors in that state. A writ of error was taken to the supreme court of the United States, on the ground that the decision violated section 1, art. 4, of the constitution, which declares that "full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state." It was decided by the supreme court that the ship, while at sea, was Massachusetts territory; that the act of the court in that state passed the title to the assignee; and that the vessel could not on her arrival in New York be attached as the insolvent's property. The proceedings in the Oregon court, as to the title of the vessel, are not questioned here. Indeed, full faith and credit are given to all the proceedings of that court. It is only objected that an officer of that court cannot become an official actor in a court of another distinct territorial jurisdiction, and this distinction appears to be of substantial merit, in view of all the authorities defining and limiting the jurisdiction of courts.

In Barton v. Barbour, 104 U. S. 126, the defendant, Barbour, was the receiver of the Washington City, Virginia Midland & Great Southern Railroad Company, a corporation organized under a law of the state of Virginia. The plaintiff was a passenger in a sleeping car upon the railroad, while it was being operated by the defendant in error, and, to recover damages for an injury sustained while a passenger, she brought a suit in personam against the defendant in the District of Columbia. It was objected, by way of plea, that the receiver had been appointed by the circuit court for the city of Alexandria, in the state of Virginia, and that leave of that court had not been obtained to bring and maintain the suit. The obejction was sustained in the lower court on a demurrer to the plea. The supreme court, in passing upon the sufficiency of the plea, said:

"Our decision upon this question will be limited to the facts of this case, which are that the receiver was appointed by a court of the state of Virginia, and the property in course of administration was in that state. The suit was brought in a court of the District of Columbia,—a foreign jurisdiction,—and the cause of action was an injury received by plaintiff in the state of Virginia, by reason of the negligence of the defendant while carrying on the business of a railroad, under the orders of the court by which he was appointed."

The court, in concluding, specially limited its decision to the facts in that case, in the following guarded language:

"We therefore declare it as our opinion that when the court of one state has a railroad or other property in its possession for administration as trust assets, and has appointed a receiver to aid it in the performance of its duty, by carrying on the business to which the property is adapted, until such time as it can be sold, with due regard to the rights of all persons interested therein, a court of another state has not jurisdiction, without leave of the court by which the receiver was appointed, to entertain a suit against him for a cause of action arising in the state in which he was appointed, and

in which the property in his possession is situated, based on his negligence, or that of his servants, in the performance of their duty in respect of such property."

The remaining authorities cited by claimant, namely, the cases of Wiswall v. Sampson, 14 How. 52; Thompson v. Scott, 4 Dill. 508, Fed. Cas. No. 13,975; Heidritter v. Oil Co., 112 U. S. 294, 5 Sup. Ct. 135; In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785; Hagan v. Lucas, 10 Pet. 400; In re Merchants' Ins. Co., 3 Biss. 162, Fed. Cas. No. 9,441,—are also inapplicable. They all center upon the proposition that, of two courts,—one a federal court, and the other a state court,—in the same state, or, more properly speaking, covering the same territorial jurisdiction with respect to the property in dispute, the court first acquiring custody of the property retains such custody undisturbed for its own purposes. As to this proposition there can be no question, and, as has been stated, Taylor v. Carryl is conclusive on this point. But, as has been heretofore observed, neither that case nor the others just referred to are authority for the proposition involved in the case at bar.

The argument by counsel for claimant that, because war ships are exempt from judicial process of courts of admiralty, the same immunity should be extended to vessels in custodia legis, is not, in my opinion, tenable. The considerations that exempt war ships from judicial process are based upon entirely different grounds than those applicable to receivers, or property in custodia legis. Briggs v. Lightboat, 11 Allen, 165; The Exchange, 7 Cranch, 117. But when a state becomes a trader, or enters into commerce, the property of the state may become subject to the adjudication of the tribunals. Hen. Adm. Jur. & Proc. 85, citing Pennsylvania v. Wheeling & B. Bridge Co., 13 How. 519. See, also, Taylor v. Best, 14 C. B. 487; Navigation Co. v. Martin, 2 El. & El. 94; U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240; U. S. v. Wilder, 3 Sumn. 308, Fed. Cas. No. 16,694. A fortiori, a receiver of an insolvent corporation, employing a vessel as a common carrier, engaged in trade and commerce, should be subject to the laws of the foreign jurisdiction into which he may conduct such business.

No consideration has been given to the fact that, at the time the vessel was seized by the marshal the second time, it was not in the actual custody of the receiver. It seems to me that the rights of the libelants must rest upon a broader foundation than the mere accident of a want of personal custody during the short interval between the relinquishment of possession by the sheriff and the seizure by the marshal. It may be observed, however, that in the case of The Davis, 10 Wall. 15, a possession acquired by the marshal, as in this case, was held sufficient to justify the court in enforcing a lien against property owned by the government. This question, however, does not occur with respect to the seizure based upon the process issued on the first libel. In that case the vessel appears to have been in the possession of the receiver, through the agency of the master or some other officer, at the time she was seized by the marshal. This decision will therefore apply to the issues raised upon the first libel, as well as to those subsequently filed. In my

opinion, the admiralty law is paramount within its jurisdiction, and only considerations of comity will prevent the court from maintaining its supremacy. These principles of comity, as they appear to have been established, do not apply to the cases at bar for the following reasons: First, the causes of action under consideration arose in this jurisdiction; second, the vessel, at the time the liens were incurred, was engaged as a common carrier in trade and commerce; third, the proceedings are in rem; and fourth, the state and federal courts are not, in this instance, of co-ordinate or concurrent territorial jurisdiction. The exceptions to the libels will therefore be overruled.