## Case No. 16,694.

### UNITED STATES v. WILDER.

[3 Sumn. 308; 1 1 Law Rep. 189.]

Circuit Court, D. Massachusetts. May Term, 1838.

GENERAL AVERAGE — LIEN OF SHIPOWNERS FOR CONTRIBUTION—GOVERNMENT AS SHIPPER—LIABILITY TO CONTRIBUTE — BOTTOMRY — LIEN FOR WAGES—PUBLIC SHIP.

1. In cases of general average, the master and owners may retain all goods of the shippers, until their share of the contribution towards the average is either paid or secured.

[Cited in Gillett v. Ellis, 11 Ill. 582.]

2. Semble, that there is no exception to the general rule in favor of the United States, or any other government or sovereignty, although there may be cases of contract, where liens on the property of government do not attach, as on that of private persons.

[Cited in Long v. Tampico, 16 Fed. 501.]

[Cited in Revenue Cutter No. 1, Case No. 11,-713; Gleeson v. Willamette Valley, 62 Fed. 305.]

3. Certain slop clothing, belonging to the United States, was shipped on board a vessel, which went ashore, and much expense was incurred in saving the goods on board. Held, that the officers of the United States had no right to take the goods shipped by them, without paying or securing their contribution to the general average.

[Cited in U. S. v. Ames, Case No. 14,441; The Siren v. U. S., 7 Wall. (74 U. S.) 160.]

4. Semble, that in cases of salvage of private ships and cargoes, the freight on board belonging to government is equally subject to the admiralty process in rem, for the proportion due for salvage, with that of mere private shippers. Quaere, how it is in cases of salvage of public ships.

[Cited in Mutual Safety Ins. Co. v. Cargo of The George, Case No. 9,981; Dupont v. Vance, 19 How. (60 U. S.) 171; The Siren v. U. S., 7 Wall. (74 U. S.) 161; U. S. v. Douglas, 10 Wall. (77 U. S.) 18.]

---

1 [Reported by Charles Sumner, Esq.]

5. The lien of seamen's wages and of bottomry bonds exists, in all cases, as much against the government, becoming proprietors by way of purchase, or forfeiture, or otherwise, as against private persons.

[Cited in The Ranier, Case No. 11,565.]

6. Sovereignty does not necessarily imply an exemption of its property from the process and jurisdiction of the courts of justice; and it seems a fair inference from the duties of the sovereign in such cases, that where a lien exists on property, upon general principles of justice, jure gentium, that lien ought to be presumed to be admitted and protected by every sovereign, until the presumption is repelled by some positive edict to the contrary.

[Cited in Clarke v. New Jersey Steam Nav. Co., Case No. 2,859.]

[Cited in Briggs v. A Light Boat, 7 Allen, 297; Briggs v. Light Boats, 11 Allen, 182–184.]

7. Quaere, whether a lien exists for repairs of a public ship, or materials therefor, or for wages of the crew thereof, or for work and labor performed upon the arms, artillery, camp equipage, and other warlike equipments of the government.

8. Quaere, whether a lien for freight, on the shipment of goods by the United States, exists against the government.

Trover for certain slop clothing. The parties agreed to the following statement of facts: "In this case it is agreed, that the schooner Jasper, from Boston to New York, went ashore on Block Island. Much expense was incurred in saving the goods, which is to be averaged by way of general average. Among the property on board, there were about one hundred bales of slop clothing belonging to the United States, invoiced at $7,320. The goods being brought back to Boston, the owners of the vessel make out an average bond for the freighters to sign. The store-keeper of the United States (by whom the clothing was shipped), declines signing the bond; claiming for the United States the right to take the goods, without paying or securing their contribution to the average. This right being denied by the owners of the vessel, they refuse to deliver the clothing to the United States, and this action is brought to recover the value of the clothing. It is agreed, that if the court are of opinion, that the United States have no such right, judgment shall be entered for the defendant [James Wilder]; and if the court are of opinion that the United States have such right, the defendant shall be defaulted, and the clothing immediately given up."

Mr. Mills, U. S. Dist. Atty.

Theophilus Parsons, for defendant.

Before STORY, Circuit Justice, and HARVEY, District Judge.

STORY, Circuit Justice. The sole question, in the present case, is, whether there exists a right of lien for the general average due on the goods (slop clothing), belonging to the United States, under the circumstances stated by the parties. There is no dispute, that there has been a general average in this case, towards which all the goods on board, and among others the slop clothing of the United

States, are to contribute. There is as little doubt, that, for such general average there does exist, on the part of the master and owners of the schooner Jasper, a right of lien against all the goods belonging to all the other shippers, except the United States. In other words, that the master and owners of the schooner, have a right to retain all the goods of such shippers, until their proper share of contribution towards the general average is either paid, or satisfactorily secured to be paid. That is sufficiently apparent from what is laid down in Abb. Shipp. pp. 361, 362, pt. 3, c. 8, § 17; Simonds v. White, 2 Barn. & C. 805, 811; Scaife v. Tobin, 3 Barn. & Adol. 523, 528, 529; The Hoffnung, 6 C. Rob. Adm. 383, 384; 2 Browne, Civ. & Adm. Law, 201; and Stev. Ave. 50, as the universal maritime law. See, also, Poth. Mar. Cont. (by Cushing) p. 76, note, 134.

The question, then, is, whether a like lien exists in regard to goods belonging to the United States. No case has been cited, in which any exception has ever been made in regard to the United States; nor has any authority been produced to show that it constitutes a known prerogative of any other government or sovereignty. I have examined the treatises upon the prerogatives of the crown of England, and I do not find there, or in any of the great abridgments of the law under the title "Prerogative," any such exception recognized, or even alluded to. The argument rests the objection upon the ground of public inconvenience, if it should be held, that, whenever a lien exists against a private person, it is to be held that the like lien attaches against the United States. And it is said, that in cases of contract for labor and services, or repairs, or supplies, with the United States, no lien can be presumed to exist; but that the only remedy is an appeal, not to law, but to the justice of the government. There may, for aught I know, be a just foundation for a distinction, as to liens, between the case of the government and that of a mere private person in many cases of contract. It may, perhaps, be justly inferred, in many cases, from the nature of certain contracts, and employments, and services for the government, that no lien attaches thereto. Thus, for example, it may be true, that no lien exists for repairs of a public ship, or for materials furnished therefor, or for wages due to the crew thereof, or for work and labor performed upon the arms, artillery, camp equipage, and other warlike equipments of the government. In such cases, the nature and use of the articles, as the means of military and naval operations, may repel any notion of any lien whatever, grounded upon the obvious intention of the parties. Many other cases of a like nature might be stated, in which the inference against a lien might be equally cogent. Some of them are alluded to in the opinion of the late lamented judge of the district court of Maryland (Judge Winchester), in the case of U. S. v. Barney [Case No. 14,525]. However, upon cases of

this sort, I desire to be understood as not expressing, because it is unnecessary in the present case, any absolute opinion. But, that in all cases of contract made by the United States, a like exemption exists, from the ordinary lien attached thereto by the maritime law, is more than I know, or am prepared to admit. On the contrary, it seems to me, that the nature of the contract itself may sometimes furnish a suitable foundation, on which to rest the presumption of a lien. Take the case of a shipment of goods, like the present, by the United States, on board of a coasting vessel for transportation from one port to another, under the terms of the common bill of lading, by which the goods are deliverable to the consignee or his assigns, he or they paying freight; I must say, that I am not prepared to declare, that the ordinary lien for freight does not attach in such a case, upon the very footing of the terms of the contract, in the same manner, as it would upon a shipment by a private person. But on this also I give no opinion; for it is not the case in judgment. The present case is not one arising under contract; but by operation of law, and, if I may so say, in invitum. It is a case of general average, where, as in a case of salvage, the right of the party arises from sacrifices made for the common benefit, or labor and services performed for the common safety. Under such circumstances the general maritime law enforces a contribution, independent of any notion of contract, upon the ground of justice and equity, according to the maxim, qui sentit commodum, sentire debet et onus. And it gives a lien in rem for the contribution, not as the only remedy, but as, in many cases, the best remedy, and in some cases the only remedy; as, for example, where the owner of the goods is unknown. Indeed, it may be asserted with entire confidence, that, in a great variety of cases, without such a lien, the ship-owner would be without any adequate redress, and would encounter most perilous responsibility. The case of Scaife v. Tobin, 3 Barn. & Adol. 523, already cited, has sufficiently established this; for in that case it was held, that against a consignee of goods, not being the owner, no remedy for contribution in personam would lie, notwithstanding his receipt of the goods; and that against him the only remedy was the detention of the goods for the contribution, unless upon a special contract.

It is said, that, in cases where the United States are a party, no remedy by suit lies against them for the contribution; and hence the conclusion is deduced, that there can be no remedy in rem. Now I confess that I should reason altogether from the same premises to the opposite conclusion. The very circumstance, that no suit would lie against the United States in its sovereign capacity, would seem to furnish the strongest ground, why the remedy in rem should be held to exist. And I do not well see how otherwise it would be practicable at all, or, if practicable, how,

without extreme peril to the ship-owner, any private ascertainment or settlement of the general average could be made at all. The United States would not be bound by any such ascertainment or settlement of the average. They might deny the correctness of the valuation and apportionment; there would be no remedy to compel a submission to the authority of any tribunal of justice; and whether the ship-owner should ever receive any compensation or not, and what compensation, would depend upon the good will of congress after, what is a most lamentable defect in the existing state of things, a protracted appeal, and after many years duration of unsuccessful and urgent solicitations to that body. And yet the contribution of every other shipper may be, and indeed must be materially dependent upon what is properly due and payable by the United States. In the case of mere private shipments a court of equity (and probably a court of admiralty, also, by a proceeding in rem) would have ample jurisdiction to compel a reluctant shipper to submit to its jurisdiction, in ascertaining and decreeing an apportionment of the contribution to be made by all the shippers. I cannot, therefore, but think, that the circumstance, that the United States can in no other way be compelled to make a just contribution of its share in the general average, so far from constituting a ground to displace the lien, created by the maritime law, does in fact furnish a strong reason for enforcing it. For I know no reason, why this court should create by its own mere authority an exemption, no where found recognised in the maritime law, and standing upon no very clear or urgent ground of public policy. To me, it is no small objection to such an exemption, that there is an entire silence on the subject, pervading all juridical treatises concerning the rights of sovereignty, and the liens created by the maritime law. Nor do I perceive any real inconvenience in asserting the lien. It is certainly competent for the treasury department, or other department of the government, to discharge debts of this sort, as well as others growing due by the United States; and, if necessary, to authorize any subordinate public officer to give due security for the payment, when ascertained, or to deposit a suitable pledge for it. The argument, therefore, addressed to this court, on behalf of the government, ab inconvenienti, does not seem to have any very solid foundation. On the other hand, the argument ab inconvenienti on the other side is very cogent and persuasive; for it is beyond doubt, that if there be no lien, there is no remedy to enforce an incontrovertible right.

I confess myself wholly unable to distinguish this case from one of salvage; and yet it has never been doubted, as far as I know, that in cases of salvage of private ships and cargoes, the freight on board. belonging to the government, is equally subject to the admiralty process in rem, for its proportion due for salvage, with that of mere private shippers. It may, for aught I know, be different in cases of the salvage of public ships. The same reasoning, however, which has been applied by the government against the lien for general average, applied with equal force against the lien for salvage of government property under all circumstances. Besides, it is by no means true, that liens existing on particular things are displaced by the government becoming, or succeeding to the proprietary interest. The lien of seamen's wages and of bottomry bonds exist in all cases as much against the government, becoming proprietors by way of purchase, or forfeiture, or otherwise, as it does against the particular things in the possession of a private person. See, also, The Copenhagen, 1 C. Rob. Adm. 289.

I have remarked, that it may be true, that no lien exists for salvage services to public ships of our own government. It seems, that in the case of The Comus, cited in 2 Dod. 464, the high court of admiralty of England declined to entertain a suit for salvage of a British ship of war. What the particular ground of that decision was, is unknown; for the case is not reported. In respect to salvage services to a public ship of war of a foreign sovereign, no decision adverse to the right of salvage has been made, although the question was directly before the court in the case of The Prins Frederik, 2 Dod. 451, and underwent a very learned discussion. That case never came to a final decision, the foreign sovereign having submitted to pay such compensation as Sir William Scott should award, and he accordingly awarded to the salvors £800. A distinction was taken in that case, which, indeed, has been often taken by writers on public law, as to the exemption of certain things from all private claims; as, for example, things devoted to sacred, religious and public purposes; things extra commercium et quorum non est commercium. That distinction might well apply to property like public ships of war, held by the sovereign jure coronæ, and not be applicable to the common property of the sovereign of a commercial character, or engaged in the common business of commerce. The case of The Alexander, 2 Dod. 37, may be supposed to have turned upon some distinction of this sort; but in reality it turned upon very different considerations. In that case, a British ship, having on board a neutral cargo, and among other things a monument, belonging to the king of Prussia, intended to be erected to the memory of his late queen, was captured by an American ship of war, and was afterwards recaptured by a British privateer. Salvage was decreed to the recaptors for the ship; but was denied as to the cargo, being neutral; and the expenses were decreed not to be a charge on the property of the king of Prussia. It is plain, that as the neutral cargo was in no danger of

condemnation, the recaptors were entitled to no salvage on that, upon the well known doctrine recognised in the British and American courts, that the recapture of neutral property confers no real benefit in ordinary cases, and, therefore, there is no foundation for any claim of salvage. See Talbot v. Seeman, 1 Cranch [5 U. S.] 1, 28, 31, 37; The War Onskan, 2 C. Rob. Adm. 299. The American prize courts, equally with the British, must have restored the monument belonging to the king of Prussia; for, although Prussia was an ally of Great Britain in her continental wars, she was neutral in the war with us.

In the case of The Exchange, 7 Cranch [11 U. S.] 116, it was considered by the court, that the ground of exemption of the ships of war of a foreign sovereign, coming into our ports, from all process, was founded upon the implied assent of our government. But it was not decided, that the other property of a foreign sovereign, not belonging to his military or naval establishment, was entitled to a similar exemption. Bynkershoek seems, indeed, in his bold and uncompromising manner to have held all the property of a foreign sovereign, including his ships of war, to be liable, in the courts of another sovereign, where they are found, to be attached for his debts. His own government, however, in a case of that sort, released the property. See Bynk. De foro Legatorum, cc. 3, 4. See, also, S. P. cited [The Exchange] 7 Cranch [11 U. S.] 125, 126, and The Prins Frederik, 2 Dod. 458–462. Bynkershoek has the support of other jurists in favor of his opinion, at least to the extent of their common private property, found in the foreign territory. Mart. Law Nat. bk. 5, § 9. But it is not necessary to consider this point further, as there may be a clear distinction between the case of a foreign sovereign and that of a domestic sovereign in this particular.

It has been laid down by Vattel (book 2, § 213) that the promises, the conventions, and all the private obligations of the sovereign are naturally subject to the same rules as those of private persons. And this, as a general rule, has been adopted in the interpretation of contracts, to which our government is a party, by the supreme court of the United States, in the case of U. S. v. Barker, 12 Wheat. [25 U. S.] 559. Vattel has added in the same place: "If there exists any difficulty on this account, it is equally conformable to prudence, to the delicacy of sentiment, which ought to be particularly conspicuous in a sovereign, and to the love of justice, to cause them to be decided by the tribunals of the state. This is the practice of the states that are civilized and governed by laws." Vatt. Law Nat. bk. 2, § 213.

I fear, that this republic cannot justly claim the praise of carrying into effect this deep and solid principle of justice. The United States are not suable even in their own courts of justice; and the several states of the Union, with very few exceptions, have insisted on the same immunity. But I do not rely upon the language of Vattel to show, that it is the duty of the sovereign to fulfill all his obligations; whether founded in contract, or implied by the general principles of law; and that sovereignty does not necessarily imply an exemption of its property from the process and jurisdiction of courts of justice. And it seems to me a fair inference from the duties of the sovereign, in such cases, that where a lien exists on property, upon general principles of justice, jure gentium, that lien ought to be presumed to be admitted and protected by every sovereign, until the presumption is repelled by some positive edict to the contrary. None such exists in our country.

It was remarked by Sir William Scott in the case of The Waterloo, 2 Dod. 433, 435, where an exemption from salvage was set up by the East India Company, on account of the salvor ship and the salved ship, being both at the time in its own service, that the exemption was "claimed from a right, otherwise universally allowed, and highly favored in law, for the protection of those, who are subjected to it; for it is for their benefit, that it exists under that favor of the law. It is what the law calls 'jus liquidissimum,' the clearest general right, that they, who have saved life and property at sea, should be rewarded for such salutary exertions; and those, who say, that they are not bound to reward, ought to prove their exemption in very definite terms, and by arguments of irresistible cogency." The same considerations apply, with the same force, to the claim for general average. And I cannot but think, that public policy will be promoted, and not impugned, by holding, that the remedy for the reward is not uncertain or precarious, but attaches as a lien, primarily in rem, and does not await the slow, or tardy, or distant justice of the government in awarding it. If there ever was a case, which ought to be settled by a court of justice, upon principles of right and liberality, this is precisely that case. No court of justice ought to decline to enforce it, unless there be some clear, definite, and incontrovertible prohibition against the exercise of it.

Finding, therefore, no such exemption from the ordinary lien for general average, as the government seeks to sustain, justified by any general principle, or any authority, I am not bold enough to create one. The consequence is, in my opinion, that the present suit is not maintainable, and that judgment ought to be entered for the defendant.

My learned brother, the district judge, concurs in this opinion, and therefore let judgment be entered accordingly.