## THE PESARO (two cases).

(District Court, S. D. New York. October 1, 1921. Supplemental Opinion
December 13, 1921.)

**International law ⊜10—Ship owned and operated by foreign government,
but employed in ordinary commerce, not immune from arrest.**

A steamship owned and operated by the Italian government, but em-
ployed as an ordinary merchant vessel in carrying passengers and cargo
for hire, *held* not immune from arrest on process from the admiralty
courts of the United States, especially in view of the fact that she was
not entitled to such immunity in the courts of Italy, and in the absence
of any request for her exemption through the official channels of the
United States.

In Admiralty. Suit by Luzzato & Sons against the steamship Pesaro,
and by Berizzi Bros. & Co. against the same. On objections to juris-
diction. Overruled.

Harrington, Bigham & Englar, of New York City, for libelants.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City,
for special claimant.

MACK, Circuit Judge. Libel in rem against the steamship Pesaro
to enforce a claim for damage to a cargo of olive oil shipped thereon.
Previously, when the ship was libeled to enforce the same claim, upon
the direct suggestion by the Italian ambassador that the ship was owned
by the Italian government and at the time of the arrest was in its pos-
session and therefore was not subject to arrest, this court vacated the
arrest. Upon appeal, the Supreme Court upheld the libelant's objec-
tion that this suggestion must come through the official channels of
the United States. The court added that it had no occasion at that time
to consider what the decree should have been if the matters affirmed
in the suggestion had been brought to the court's attention and estab-
lished in an appropriate way. The Pesaro, 255 U. S. 216, 41 Sup.
Ct. 308, 65 L. Ed. ——, decided February 28, 1921.

By stipulation, the parties have agreed that the question of jurisdic-
tion shall be decided upon the basis of the following facts: First.
That the steamship Pesaro was owned by the kingdom of Italy, regis-
tered in the name of ministry for railway and maritime transportation,
a department of the Royal Italian government charged with affairs of
maritime and rail transportation, which has as its head a member of the
Italian cabinet. Second. That the steamship was in the possession of
the Italian government, being manned by a master, officers, and crew
employed by and under the direction of the ministry for railway and
maritime transportation and paid by it. Such master, officers, and
crew were civilians not under the orders of or connected with the
Italian naval or military forces, and the vessel was not carried on the
roster of the Italian navy as a naval vessel. Third. That the steam-
ship Pesaro was engaged in commercial trade carrying passengers and
goods for hire, and in such trade was not functioning in a naval or
military capacity, or under the immediate direction of the department

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the Italian government having to do with naval and military affairs. Fourth. That the letter (the substance of which, so far as necessary, is given in a note below [1]) of Advocatto Francisco Montefredini, dated June 21, 1920, may be read by either party on the trial of the issues raised by the libel and the special claim and plea in abatement as the evidence of Francisco Montefredini with the same force and effect as if he had testified in accordance with the said letter; subject, however, to objection by either party to the case as to the materiality, relevancy, or competency of the matters referred to in the said letter, or any of them.

The Supreme Court has recently intimated that it considered the question whether the ship of a foreign government used and operated by it as a merchant vessel is, when within the waters of the United States, immune from arrest in admiralty, as "important and also new," and that the "proper solution is not plain but debatable." In re Hussein Lufti Bey, 256 U. S. ——, 41 Sup. Ct. 609, 65 L. Ed. ——, decided June 6, 1921; In re Muir, 254 U. S. 522, 41 Sup. Ct. 185, 65 L. Ed. ——, decided January 17, 1921. For that reason a re-examination of this question would seem to be justified, if not required, notwithstanding the decision in this court in The Maipo, 252 Fed. 627, 259 Fed. 367, and the views expressed by the Circuit Court of Appeals in the Carlo Poma, 259 Fed. 369, 170 C. C. A. 345, especially as the decree in the latter case was vacated by the Supreme Court for want of jurisdiction in the Court of Appeals, decided February 28, 1921, 255 U. S. 219, 41 Sup. Ct. 309, 65 L. Ed. ——.

The general principle of the immunity of a sovereign state from suit without its express consent is too deeply imbedded in our law to be uprooted by judicial decision. See Ex parte in the Matter of the State of New York, Edward S. Walsh, Superintendent, 256 U. S. ——, 41 Sup. Ct. 588, 65 L. Ed. ——, U. S. Sup. Ct. June 1, 1921. While the

---

[1] "1. Question. Is a ship owned by the United States and operated for the United States as a merchant vessel by a private steamship company immune from arrest in the Italian courts on a claim for damage to cargo or any other claim to which a private ship is ordinarily subject to arrest in the Italian courts?

"Answer. No. Such steamers, notwithstanding they may be owned by the U. S. government are considered in Italy just the same as a privately owned merchant vessel, and are, therefore, subject to arrest, but always on the authority of the president of the tribunal.. * * *

"The U. S. S. B. steamers are subject to arrest, as above, only because they are merchant vessels, as according to the Italian law there is no difference between a vessel owned by a foreign government or by a private company, provided it is engaged in commercial operations. Only men of war are immune from arrest for claims. * * *

"4. Question. Is the ship owned by the Italian government operated as a merchant vessel by the Italian government free from arrest in ordinary, judicial process in the Italian courts?

"Answer. During the war all Italian steamers were requisitioned, but notwithstanding were subject to arrest.

"This was simply a legal point, and the steamer was immediately released as the government guaranteed any possible sentence, withholding from the charter money until settlement of case a sufficient amount to cover any claim.

"Now this procedure will be discontinued and all merchant vessels, whether government-owned or privately owned, will be subject to arrest."

principle has been fervently defended by some jurists as vital and fundamental to sovereignty (see dissenting opinion of Justice Gray in U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171), the extent to which it has been carried or retained in modern law has been the subject of strong criticism (Story, J., in U. S. v. Wilder, 3 Sumn. 308, Fed. Cas. No. 16,694; Laski, The Responsibility of the State in England, 32 Harvard Law Review, 447; Maguire State Liability for Tort, 30 Harvard Law Review, 20; cf. Lord, Admiralty Claims Against the Government, 19 Col. L. R., 467; Weston, Actions Against the Property of Sovereigns, 32 Harvard Law Review, 266), and there is observable a tendency to restrict its application or to guard against its extension (U. S. v. Lee, supra; cf. South Carolina v. U. S., 199 U. S. 437, 26 Sup. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737).

Where the application of the doctrine is not clear, a solution is not to be found by reference to strict Austinian theory which assumes, by mere definition, that the sovereign is not subject to his own laws. Nor is it to be found by uncritical reference to historical origins. The reasons which in the past led to the exemption of the sovereign from suit may or may not justify the extension of the principle in modern law. In dealing with admiralty causes, historical or theoretical conceptions peculiar to the common law must not be assumed to be a part of the maritime law of nations.

In attempting to solve a confessedly new and unsettled problem, the court, while conforming its decision to certain forms or standards evolved from within the legal system, should not determine the application of these standards solely by logic. It may have to choose between competing judicial analogies and parallel trends of juristic thought; its conclusions should, if possible, conform to the practical ends of the law in a moving, working world.

So in dealing with an unsettled problem in the application of sovereign immunity, the court must not only consider history and logic; it must also look behind and beyond both and inquire whether the public interests justify or require an extension of sovereign exemption from the usual processes of judicial justice. With the growth and development of state activity. it behooves the court to consider the consequences which would flow from a ruling removing from the ordinary judicial administration matters of vital importance to the community, which have for centuries been handled through the regular judicial processes.

The question of the exemption from attachment of a ship of a friendly sovereign first arose in our courts in the case of The Exchange, 7 Cranch, 117, 3 L. Ed. 287. It concerned a public foreign ship of war. Bynkershoek had stirred the question whether any ship was immune from seizure. having laid it down as a general proposition that the property of a foreign sovereign was not exempt from attachment De Foro Legatorum, ch. IB. Marshall, C. J., pointed out that—

"The jurisdiction of the nation within its own territory was necessarily exclusive and absolute and susceptible of no limitation not imposed by itself. * * * All exceptions to the full and complete power of a nation, within its own territories, must be traced up to the consent of the nation itself. * * * This consent may, in some instances, be tested by common usage

and by common opinion growing out of that usage. * * * One sovereign. being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in confidence that the immunities belonging to his independent sovereign station,. though not expressly stipulated, are reserved by implication, and will be extended to him."

Marshall consequently concluded as a principle of public law that ships of war entering the port of a friendly power, open to their reception, are to be considered by the consent of that power as exempt from. its jurisdiction.

While the court had no occasion to consider the case of a public ship used for trading purposes, Marshall (page 145) pointed out "a manifest distinction between the private property of the person who happens to be a prince and the military force which supports the sovereign power and maintains the dignity and independence of a nation. A prince by acquiring private property in a foreign country may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince and assuming the character of a private individual; but this he cannot be presumed to do with respect to any portion of that armed' force, which upholds his crown, and the nation he is entrusted to govern."

While Marshall was probably referring to the private property of a prince as a private person, it is interesting to note the similarity of his language to that employed by him in the case of a state engaging in a commercial undertaking. In Bank of U. S. v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, he said:

"It is, we think, a sound principle that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted." [2]

See, also, Bank of Kentucky v. Wister, 2 Pet. 318, 7 L. Ed. 437; Briscoe v. Bank of Kentucky, 11 Pet. 256, 323, 9 L. Ed. 709; Louisville R. R. v. Letson, 2 How. 497, 550, 11 L. Ed. 353; Curran v. Ark, 15 How. 304, 308, 14 L. Ed. 705; Panama R. R. v. Curran, 256 Fed. 772, 168 C. C. A. 114; Lord & Burnham v. U. S. S. B., E. F. C. (D. C.) 265 Fed. 955, 957.

[2] Compare the remarks of Lord Stowell in The Swift, 1 Dodo, 320, 339: "The utmost that I can venture to admit is that, if the king traded, as some sovereigns do, he might fall within the operation of these statutes. Some sovereigns have a monopoly of certain commodities, in which they traffick; and, if the king of England so possessed and so exercised any monopoly, I am not prepared to say that he must not conform his traffick to the general rules by which all trade is regulated. But the present question is—is this distribution of the public stores for the public use, a trading within the view of the statute. Looking to authority, as well as principle, and to the public convenience, I conceive, it is not."

In U. S. v. Wilder, 3 Sumn. 308, 315–317, Fed. Cas. No. 16,694, Mr. Justice Story apparently was of the opinion that a government-owned merchant vessel might not be entitled to the same privileges and immunities as a ship of war. He said:

"A distinction was taken in that case (The Prins Frederik, 2 Dod. R. 451), which, indeed, has been often taken by writers on public law, as to the exemption of certain things from all private claims; as, for example, things devoted to sacred, religious and public purposes; things extra commercium et quorum non est commercium. That distinction might well apply to property like public ships of war, held by the sovereign jure coronæ, and not to be applicable to common property of the sovereign of a commercial character or engaged in the common business of commerce. * * *

"In the case of The Schooner Exchange (7 Cranch R. 116), it was considered by the court that the ground of exemption of the ships of war of a foreign sovereign coming into our ports, from all process, was founded upon the implied assent of our government. But it was not decided that the other property of a foreign sovereign, not belonging to his military or navy establishment, was entitled to a similar exemption. Bynkershoek seems, indeed, in his bold and uncompromising manner to have held all the property of a foreign sovereign, including his ships of war, to be liable, in the courts of another sovereign, where they are found, to be attached for his debts. His own government, in a case of that sort, released the property. Bynkershoek has the support of other jurists in favor of his opinion at least to the extent of their common private property, found in the foreign territory. But it is not necessary to consider this point further, as there may be a clear distinction between the case of a foreign sovereign and that of a domestic sovereign in this particular.

"It has been laid down by Vattel (B. 2, S. 213) that the promises, the conventions, and all the private obligations of the sovereign, are naturally subject to the same rules, as those of private persons. And this, as a general rule, has been adopted in the interpretation of contracts, to which our government is a party, by the Supreme Court of the U. S., in the case of U. S. v. Barker, 12 Wheaton R. 559. Vattel has added in the same place: 'If there exists any difficulty on this account, it is equally conformable to prudence, to the delicacy of sentiment which ought to be conspicuous in a sovereign, and to the love of justice, to cause them to be decided by the tribunals of the state. This is the practice of the states that are civilized and governed by laws.' (Vattel, B. 2 S. 213.) I fear that this republic cannot justly claim the praise of carrying into effect this deep and solid principle of justice; and the several states of the Union, with very few exceptions, have insisted on the same immunity. But I do not rely upon the language of Vattel to show that it is the duty of the sovereign to fulfill all his obligations, whether founded in contract or implied by the general principles of law; and that sovereignty does not necessarily imply an exemption of its property from the process and jurisdiction of courts of justice."

U. S. v. Wilder, it is true, is not a direct authority for the proposition here in question. The decision in that case was simply to the effect that government-owned cargoes not in the possession of the government could be withheld by virtue of a maritime lien arising from the obligation of the cargo to contribute in general average. In The Davis, 10 Wall. 15, 19 L. Ed. 875, the Supreme Court went a step further and held that such cargoes could not only be retained without judicial process by the ship owner but could be libeled in admiralty by salvors seeking to enforce their lien against ship and cargo. See, to the same effect. Johnson Lighterage Co. (D. C.) 231 Fed. 365. But cf. The Fidelity, 16 Blatchf. 569, 8 Fed. Cases, 4758. Similarly, in Long v. Tampico (D. C.) 16 Fed. 491, revenue cutters belonging to the Mexican

government but not yet delivered into her possession were held subject to libel for salvage services. On the same principle, a requisitioned vessel manned and operated for the Italian government by her owners was held subject to attachment in The Attualita, 238 Fed. 909, 152 C. C. A. 43.

On the other hand, in Briggs v. The Light Boat, 11 Allen (Mass.) 157, in an able and exhaustive opinion which has frequently been referred to by the Supreme Court, Judge Gray held that immunity of public ships was not restricted to ships of war; that "the exemption of a public ship of war of a foreign government from the jurisdiction of our courts depends rather upon its public than upon its military character"; that, in consequence, lightships belonging to and in the possession of the United States could not be attached to secure the enforcement of a mechanic's lien. It should be remembered, however, that the case did not arise in admiralty and the actual decision does not go beyond that of the Supreme Court in Ex parte in the Matter of the State of New York et al., owners of the Steam Tug Queen City, 256 U. S. ——, 41 Sup. Ct. 592, 65 L. Ed. ——, decided June 1, 1921, in which the question of the immunity of a public trading vessel from a libel in rem was expressly reserved. In Mason v. Intercolonial Railway, 197 Mass. 349, 83 N. E. 876, 16 L. R. A. (N. S.) 276, 125 Am. St. Rep. 371, 14 Ann. Cas. 574, the Massachusetts Court, relying upon Briggs v. The Light Boat, supra, held that funds belonging to the Canadian State Railway were not subject to attachment under state law by trustee process.

The English courts grant exemption to a merchant vessel owned and operated by a sovereign state even in admiralty. Sir Robert Phillimore, in the Charkieh, L. R. 4, A. and E. 59, and in the Parlement Belge, 4 Probate Div. 129, after a careful examination of the authorities and a comparison of the civil law on the subject, came to the conclusion that the exemption of a public ship from seizure did not extend to a vessel engaged in commerce, whose owner was (to use the expression of Bynkershoek) strenue mercatorem agens. But, in the latter case, on appeal (5 Prob. Div. 197), Sir Robert's opinion was not sustained. The Court of Appeals found that the carrying of passengers and merchandise had been subordinated to the duty of carrying the mails and that the mere fact that the Parlement Belge had been subordinately and partially used for trading purposes did not take away its general immunity, even if an action in rem were deemed to be a proceeding solely against the property, and not a procedure directly or indirectly impleading the owner of the property to answer the judgment of the court. It was careful, however, to point out that in its opinion the owner was indirectly impleaded. Taking this dictum as a starting point, the English admiralty courts by successive decisions have come to recognize that all government-owned ships, whether used for military, political, or commercial purposes, are in time of peace, as well as of war, immune from seizure. Young v. Scotia, 1903 A. C. 501 (ferry-boat used as part of Canadian state railways); The Jassy, 1906 Prob. Div. 270 (merchant vessel used as part of Roumanian state railways); The Broadmayne, 1916 Prob. Div. 64 (requisitioned vessel operated in

government service by private owner) ; The Gagara, 1919 Prob. Div. 95; Porto Alexandre, 1920 Prob. Div. 30 (merchant vessels owned and operated by friendly sovereign states).

The basis of these decisions is almost exclusively the authority of the Parlement Belge, supra. In Porto Alexandre, the great difficulties involved in granting an immunity so extensive were pressed upon the court; but it felt bound by authority. Lord Justice Scrutton expressed the view that—

These practical difficulties must "be dealt with by negotiotions between governments and not by governments exercising their power to interfere with the property of other states contrary to the principles of international courtesy which govern the relations between independent sovereign states."

The question, however, is whether international courtesy does or does not require this immunity to friendly foreign states, particularly if the immunity does not exist in favor of the sovereign's own similar interests in his own courts. Certainly there appears to be no consensus of opinion among international jurists to this effect. See Wheaton International Law, edited by Coleman Philipson (1916) p. 161; also, 12 Revue Generale de Droit International Public (1905) p. 143. While the French Court of Appeal at Rennes held a merchantman owned by the British government carrying wheat and wool for the Allied Governments immune from seizure, it took occasion to point out that the vessel was being utilized "with an object of political interest for the need of national defense, apart from all idea of gain and speculation." More recent decisions of inferior French tribunals, following the English precedents in declining jurisdiction over public vessels employed in commercial service, have been adversely criticized. Journal de la Marine Marchande, February 3, 1921.

From the evidence before me it would appear that the Italian courts refuse to grant immunity in such cases. In section 9 of the Shipping Act (Comp. St. § 8146e), Congress expressly declared that vessels purchased from the Shipping Board, while employed solely as merchant vessels, shall be subject to the laws, regulations, and liabilities governing merchant vessels; and even during the war emergency, this section was broadly construed by the Supreme Court. The Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962. Since then, the method of enforcing the liability of our public merchant vessels has been changed by the Suits in Admiralty Act so that the ships cannot and need not be arrested or detained, but the nature of their liability remains unchanged and is enforceable in the courts. Certainly then the exercise of jurisdiction by the courts in the case of public merchantmen cannot to-day be considered novel or revolutionary. The executive branch of our government, it may be assumed, will not be slow to bring to the attention of the judiciary by appropriate suggestion any matter of international courtesy or concern. The failure of our State Department to take any action in these cases is not without significance.[3] (Hearings

[3] In answer to my inquiry, the Secretary of State, through the Solicitor for the State Department, stated on August 2, 1921:

"It is the view of the Department that government-owned merchant vessels or vessels under requisition of governments whose flag they fly employed in

before Committee on Judiciary in H. R. 7124, Suits in Admiralty Act, 66th Congress, 1st Sess., August 26, 1919, p. 38), although I do not mean to say that immunity should be refused in a clear case simply because the executive branch has failed to act.

The English decisions above mentioned seem to proceed on the principle that a ship cannot be libeled in rem where the owner cannot under the common law be impleaded in personam. This doctrine, so far as effective, would appear to be peculiar to English admiralty and is not accepted as a part of the maritime law in this and other countries. As Justice Gray stated in Homer Ramsdell Co. v. Com. Gen. Trans., 182 U. S. 406, 413, 21 Sup. Ct. 831, 45 L. Ed. 1155, a case involving the liability of a ship for the negligence of a compulsory pilot:

"There is no occasion to refer further to the English cases in admiralty, because in England it is held that the ship is not responsible in admiralty, where the owner would not be at common law, differing in this respect from our own decisions. The China, 7 Wall. 53; Ralli v. Troop (1894) 157 U. S. 386, 402, 420; The John G. Stevens (1898) 170 U. S. 113, 120–122; The Barnstable (1901) 181 U. S. 464."

See The Maria, 1 W. Rob. 95, 106; The Halley, L. R. 2 P. C. 193, 201.

Lord Stowell, in Neptune II, 1 Dod. 467, had earlier laid down the rule as to the ship's responsibility for the acts of its pilots in accordance with the general maritime law. And it is perhaps no mere accident that Sir Robert Phillimore, whose views on the maritime law were rejected by the common-law judges sitting in the Court of Appeals in the case of the Parlement Belge, supra, happened to differ from the Privy Council in the case of The Halley, L. R. 2 Ad. & Ec. 3.

It is also important to note that in the Siren, 7 Wall. 152, 19 L. Ed. 129, the Supreme Court recognized that a ship in the possession of the government might be held to respond in damages for the negligence of its officers resulting in a collision where the government brought the ship into court to be adjudicated as a prize. It would seem that even the English courts have gone so far as to apply the doctrine of respondeat superior to a public ship in admiralty where the government consents to the suit. The Athol, 1 W. Rob. 374, 382. The procedural bar removed, it would appear that even a tort liability may in some instances at least be imposed upon a ship owned and operated by the government, notwithstanding the fact that the government could not, on common-law principles, be impleaded in the court of claims on the basis of such a complaint (cf., also, Workman v. N. Y., 179 U. S. 570, 21 Sup. Ct. 212, 45 L. Ed. 314. In this connection, the words of Judge Story in U. S. v. Wilder, Fed. Cas. No. 16,694, 3 Sumn. 308, 312), are important:

commerce should not be regarded as entitled to the immunities accorded public vessels of war. The Department has not claimed immunity for American vessels of this character. In cases of private litigation in American ports involving merchant vessels owned by foreign governments, the Department has made it a practice carefully to refrain from taking any action which might constitute an interference by the authorities of this government in such litigation."

"It is said that in cases where the United States are a party, no remedy by suit lies against them for contribution; and hence the conclusion is deduced that there can be no remedy in rem. Now, I confess, that I should reason altogether from the same premises to the opposite conclusion. The very circumstance that no suit would lie against the United States, in its sovereign capacity, would seem to furnish the strongest ground, why the remedy in rem should be held to exist."

Whatever may be the common law or the civil law on the subject, and it is not necessary to go into that question here, it should be remembered that the responsibility of a ship in admiralty is not derived from either. It had its sources, as has been frequently pointed out, in the commercial usages and jurisprudence of the middle ages, and earlier. Originally, the primary liability was upon the vessel; that of the owner was not personal but incidental to her ownership; from this, he was discharged either by the loss of the vessel or by abandoning her to creditors. The China, 7 Wall. 53, 68, 19 L. Ed. 67; The Barnstable, 181 U. S. 464, 467, 21 Sup. Ct. 684, 45 L. Ed. 954. If, as I believe, sound principles of admiralty jurisprudence require that a ship be treated as an entity separate and distinct from her owner, the immunity of a public ship should depend primarily not upon her ownership but upon the nature of the service in which she is engaged and the purpose for which she is employed. That is a distinction or standard towards which Bynkershoek, Marshall, and Stowell tended and in favor of which there is not only the specific authority of Story and Phillimore but the force of judicial analogy and the requirements of modern economic life.

If the Pesaro is not immune from seizure by reason of her government ownership, it would seem clear that she could not claim exemption from attachment on account of the merchant service in which she was engaged. While in The Davis, 10 Wall. 15, 19 L. Ed. 875, Long v. Tampico (D. C.) 16 Fed. 491, and The Attualita, 238 Fed. 909, 152 C. C. A. 43, the lack of possession by the government was stressed as of vital importance, in my judgment, such possession is not the exclusive criterion. Since, apart from the question of possible immunity by reason of government ownership, it is generally recognized that without treaty provisions, merchant ships are not exempt from seizure by reason of their employment in the postal service (Bonfils, Manuel de droit International [7th Ed.] 1914, § 629), immunity should not be given vessels owned and employed by the government in ordinary times in the usual channels of trade. To deprive parties injured in the ordinary course of trade of their common and well-established legal remedies would not only work great hardship on them, but in the long run it would operate to the disadvantage and detriment of those in whose favor the immunity might be granted. Shippers would hesitate to trade with government ships, and salvors would run few risks to save the property of friendly sovereigns, if they were denied recourse to our own courts and left to prosecute their claims in foreign tribunals in distant lands. See Hearings before Committee on Judiciary on H. R. 7124 (Suits in Admiralty Act), 66th Congress, 1st Session, August 26. 1919, pp. 32 and 45. The attachment of public trading vessels, in my judgment, is not incompatible with the public in-

terests of any nation or with the respect and deference due a foreign power.

In many phases of our law to-day it becomes necessary to distinguish between those cases in which it is, and those cases in which it is not, consistent with the public needs and interests to subject the state, its agencies and properties to the ordinary processes of the law. True it is that in certain cases, involving historic functions of the state, the law is too well settled to admit of doubt or of any nice balancing of interests to determine whether or not judicial processes may be evoked. But where the law cannot be said to be plainly settled, it becomes the duty of the court to determine whether or not the public needs militate against the enforcement through the appropriate judicial channels of the ordinary rules of justice.

The question is not merely whether the function in issue is governmental or private; it is doubtful whether any activity of the state may properly be called private. The public service functions of the state to-day may be as important in their bearing and as public in their character as the more limited functions to which it was the custom of the state to confine itself a century ago. In developing this field of law, expressions used by the courts have often been inept and inaccurate; the distinctions drawn in specific cases specious and negligible. Yet a sound principle, though at times perhaps dimly discerned and mistakenly applied, underlies the cases. The principle is developing in the field of municipal corporations. City of Los Angeles v. Los Angeles Gas Corporation, 251 U. S. 32, 40 Sup. Ct. 76, 64 L. Ed. 121. The principle also finds application in the delimitation of the sphere in which the instrumentalities of a state are immune under our Constitution from federal taxation. South Carolina v. U. S., 199 U. S. 437, 26 Sup. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737. While these cases involve the question of substantive liability rather than procedural immunity, the analogy is none the less pertinent; in my opinion, a government ship should not be immune from seizure as such, but only by reason of the nature of the service in which she is engaged.

And as the Pesaro was employed as an ordinary merchant vessel for commercial purposes at a time when no emergency existed or was declared, she should not be immune from arrest in admiralty, especially as no exemption has been claimed for her, by reason of her sovereign or political character, through the official channels of the United States.

But if I err in believing that the accepted law of this country does not require a holding that merchant vessels owned and operated as such by a foreign sovereign state are, therefore, exempt from seizure, the Pesaro would, nevertheless, not be entitled to immunity.

I do not base this upon the fact that ships owned and operated for commercial purposes by the United States would not be exempt from ordinary process under Italian law, for retaliation and reprisal are for the executive branches of our government and not for the courts. The Nereide, 9 Cranch, 388, 422, 3 L. Ed. 769; Bank of Augusta v. Earle, 13 Pet. 519, 589, 10 L. Ed. 274; Beale I Conflicts of Law, pt. I, p. 103. The doctrine of reciprocity in Hilton v. Guyot, 159 U. S. 113, 16

Sup. Ct. 139, 40 L. Ed. 95, should not be extended to a case involving the very jurisdiction of the court.

But the fact that the steamship Pesaro itself is subject to the ordinary processes of the Italian court would seem to be vital and decisive. There is no reason of international comity or courtesy which requires that Italian property not deemed extra commercium in Italy should be treated as res publica and extra commercium in the United States. In Bank of U. S. v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, Chief Justice Marshall said:

"The state of Georgia, by giving to the bank its capacity to sue and be sued, voluntarily strips itself of sovereign character. so far as respects the transactions of the bank, and waives all the privileges of that character. * * * We think * * * that the Planters' Bank of Georgia is not exempted from being sued in the federal courts, by the circumstance that the state is a corporator."

So it may be said here that the Italian government, by giving to the Pesaro the capacity to be sued in the Italian courts, voluntarily strips the Pesaro of its sovereign character and waives all privileges of that character; and that therefore the Pesaro is not exempt from suit in the United States, by reason of its governmental ownership and operation. For if a libel can be maintained against the steamship Pesaro in the courts of Italy, it is difficult to see why our tribunals should decline jurisdiction; there is less reason therefor in a case of this sort than in The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152.

## Supplemental Opinion.

My attention has been directed, and I have given further consideration to some of the continental authorities on the subject. There is, as has already been indicated, much difference of opinion among the European jurists as to the extent of the immunity to be accorded foreign sovereign states. Conservative opinion seems to favor the non-suability of foreign sovereign states in practically all cases. See Loening, Die Gerichtsbarkeit über fremde Staaten und Souveräne, 1903, v. Dynovsky, Unzulaessigkeit einer Zwangsvollstreckung gegen auslaendische Staaten; Van Praag, Jurisdiction et Droit International, 1915, pp. 340–405. But some of the most eminent jurists have vigorously opposed according immunity from judicial process to foreign states in matters not affecting their political or sovereign rights. Fiore, Nouveau Droit International, No. 500 ff.; Von Bar, Annuaire de l'Institut de Droit International, vol. XI, p. 414 ff.; Laurent, Le Droit Civil International, vol. III. pp. 74–89; Despagnet, Droit International Privé, No. 179; Weiss, Traité de Droit International Privé, 2d Ed., vol. V, pp. 85–115; Baudry-Lacantinerie et Houques Fourcade, Droit Civil, Des Personnes. vol. 1, No. 657; De Lapradelle, 1910, Darras-De Lapradelle (Revue de Droit International Privé) vol. VI, p. 779. The Institute of International Law at its conference at Hamburg in 1891 adopted a number of resolutions proposed in the report of Bon Bar with reference to actions against foreign states. Among those actions recognized by the Institute as properly maintainable against a foreign sovereign state were:

"Les actions qui se rapportent à un établissement de commerce ou indus-
triel ou à un chemin de fer exploité par l'état dans le territoire. * * *
Les actions en dommages—intérêts nées d'un quasi-délit, qui a ou lieu sur le
territoire. Annuaire de l'Institut de Droit International, vol. XI, p. 436."

The suability of a merchant vessel owned and operated by a foreign
state would apparently fall within the principles, if not the literal rules,
formulated by the Institute. These principles were recognized to some
extent in the Treaty of Peace with Germany, article 289 of which
provided:

"If the German government engages in international trade, it shall not in
respect thereof have or be deemed to have any rights, privileges or immuni-
ties of sovereignty."

There seems to be quite a conflict of views in the actual jurispru-
dence of European countries in this matter. Walton, State Immunity
in the Laws of England, France, Italy and Belgium, Journal of Com-
parative Legislation and International Law, October 1920 (Third
Series, vol. II, pt. I, p. 252) ; Van Praag, op. cit., pp. 400–407. The
German decisions have tended to accord foreign sovereign states vir-
tually complete immunity. Von Hellfield v. Russian Government (An-
halt Case) ; In the Royal Prussian Court for the Determination of Ju-
risdictional Conflicts, 1910 (reported in full, 5 American Journal of
International Law, 490) ; Salling v. U. S. Shipping Board (S. S. Ice
King), Hanseatische Gerichtszeitung (Hauptblatt), 1921, p. 85, p. 110.
The French jurisprudence, as has already been indicated, looks in the
same direction. Lambiege & Pujol v. Spanish Government, 1849,
Dalloz I, 5; The Englewood, Clunet, 1920, p. 621, and Darras-De
Lapradelle, 1921, p. 74. But see Lakkowsky v. Office Suisse, Darras-
De Lapradelle, 1921, p. 70. It is possible that both the French and
German courts have felt that analogous actions brought against their
own governments would, in the absence of statutory enactment, more
naturally under their system of law, come under the purview of their
administrative tribunals, which, of course, could not entertain com-
plaints against foreign states, and they consequently may have seen
some embarrassment and difficulty in subjecting foreign states to
tribunals incompetent to act against their own governments. If this
be true, it only emphasizes the desirability of keeping the admiralty
rules so far as possible free from the peculiarities of local law and
jurisprudence. It is unnecessary here to consider how the somewhat
similar problem that arises where a foreign state engages in a commer-
cial undertaking, such as the operation of a railway, within the juris-
diction of another state, should be dealt with. The Italian tribunals
(Clunet, 1888, p. 289; Clunet, 1889, p. 335; Darras-De Lapradelle,
1906, p. 527) and also the Swiss (Dryfus v. Austrian Ministry of
Finance, Darras-De Lapradelle, 1918, p. 172) go very far in holding
foreign states subject to their jurisdiction whenever the foreign states
are acting, as it is phrased, not in a sovereign or political capacity (jure
imperii), but as subjects of civil rights (jure gestionis). The Belgian
jurisprudence is in accord with that of Switzerland and Italy as to the
power of the courts to assume jurisdiction and give judgment, but
doubt is cast on the power of the courts to attach or levy execution

against the property of a foreign state. Liege & Luxemberg Ry. v. The Netherlands, Clunet, 1904, p. 417; Ottoman Government v. Gaspary and Slioberg, Pasicrisie Belge, 1911, p. 104. The doubt raised may be a source of difficulty in some cases; but where, as here, a specific claim arising in the ordinary course of trade is asserted against property employed for commercial purposes, which, if in the possession of a public service corporation, would be subject to seizure, there seems little reason against enforcing, by detention, and if need be sale, of such property of a foreign state, a judgment reached by those judicial processes which are recognized in all civilized countries as binding between individuals and corporations. In countries where declaratory judgments are authorized, such judgments might be of some value even though there were no power of compulsory execution. But the enforcement of such judgments only through resort to distant foreign lands or through the delicate medium of diplomatic representations would fail adequately to serve the needs of modern economic life. These should indeed yield to the greater need of peaceful and harmonious international relations, but it seems improbable that in these days the judicial seizure of a publicly owned merchantman like the Pesaro would affect our foreign relations in any greater degree than the judicial seizure of a great privately owned merchantman like the Aquitania. Indeed, it would seem that foreign relations are much less likely to be disturbed if the rights and obligations of foreign states growing out of their ordinary civil transactions were dealt with by the established rules of law, than if they were made a matter of diplomatic concern.

I have not attempted to discuss many points of distinction involved in the European jurisprudence and doctrine, but my examination of the foreign law, such as it was, has served to strengthen the conclusion heretofore announced in these cases.