### THE GUL DJEMAL, and four other cases.

(District Court, S. D. New York. December 22, 1920. On Reargument, January 3, 1921.)

International law ⊙⟹10—Courts cannot entertain unofficial suggestions on behalf of foreign government, which has severed diplomatic relations with the United States.

When a foreign country has severed diplomatic relations with the United States, the intercourse thereafter to be carried on between the governments should be conducted exclusively through the State Department, in view of Rev. St. § 202 (Comp. St. § 300), and a court, which has arrested a vessel of such foreign government, cannot entertain unofficial suggestions made on behalf of such government by the recognized representative of another foreign power in charge of such government's affairs in this country.

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by the Mt. Royal Steamship Company, Limited, against the steamship Gul Djemal, her engines, boilers, etc., heard with four other cases. On motion to release the steamship from arrest. Motion denied.

See, also, 256 U. S. 616, 41 Sup. Ct. 609, 65 L. Ed. 1122; 296 Fed. 567.

Harrington, Bigham & Englar, of New York City, for libelant Mt. Royal S. S. Co.

Hardy, Stancliffe & Whitaker, of New York City, for libelant Union Stevedoring Corporation.

Purrington & McConnell, of New York City, for claimant of the Gul Djemal and respondents.

KNOX, District Judge. The question as to whether I should, in view of the suggestion filed herein by the Spanish ambassador upon behalf of the Turkish government, release the Gul Djemal from arrest, is one of considerable importance and not free from doubt. It is my opinion, however, that the motion should be denied, not only as a matter of law, but by reason of the practical consideration that by denying the motion the ship can, upon appeal, have corrected any error now made by me. If I were to grant the motion, and such action should hereafter be held by the appellate court to be erroneous, the libelants would be without recourse to the ship.

The urgency of a prompt decision makes impossible any extended discussion of the law involved. I may say, however, that it does seem to me that, in the very nature of things, the relations now existing between this country and the government of Turkey must, in some respects, differ from those that obtain between the United States and a government with which diplomatic relations are not severed. If a breach of such relations means simply that thereafter a government may by indirection obtain and secure for itself the same rights and privileges that would, but for the breach, be directly accorded it, the severance of relations is an idle ceremony, so far as comity between nations is concerned.

In recognition of that comity which, under the law of nations, exists between friendly states, this court, in litigations such as The Carlo Poma, 259 Fed. 369, and kindred cases, has from time to time released from arrest the property of foreign governments, when the ambassadors of such governments have suggested to us the sovereign character of the ownership thereof. When, however, a foreign government has seen fit to sever diplomatic relations with the United States, I am of opinion that it is not the function of the court to entertain unofficial suggestions made upon behalf of such government.

The courts of the United States are in no position to be acquainted with the degree of strain that in any particular instance may exist between this government and one that has severed relations with us, and while, so far as appears, the release of the Gul Djemal would not embarrass the Department of State, I am, nevertheless, reluctant to establish a precedent that in conceivable circumstances might embarrass

that department. It is true that a letter addressed to proctors for the ship by the State Department recognizes the fact that the interests of Turkey within the United States are being looked after by the Spanish ambassador, and it is he who now suggests to the court that the Gul Djemal is owned by the Turkish government. I am desirous of according all consideration to the ambassador and his government, but feel constrained to suggest that any protection to Turkish interests here involved should be by way of representations to the Department of State, and to say that in his present suggestion the ambassador speaks not as the personal representative of the king of Spain but unofficially, by virtue of the good offices which he has placed at the disposal of the government of Turkey.

In such capacity I must respectfully decline to adopt his suggestion, and for the relief he asks relegate him to the Department of State.

### On Reargument of Motion to Release Steamship Gul Djemal from Arrest.

Since rendering my decision of December 22, 1920, wherein I denied the motion to release the Gul Djemal from arrest, the following letters were exchanged between the Spanish ambassador and the Acting Secretary of State:

"Embajada De Espana, Washington.

"Washington, D. C., December 23, 1920.

"My dear Mr. Secretary: Subsequent to the severance of diplomatic relations between the Turkish government and the United States, his majesty's government at Madrid officially instructed me to assume charge of Turkish governmental interests in the United States, in which capacity I have had the honor to communicate and treat with this department continuously. I now have the honor to inform you that the steamship Gul Djemal, which is owned, manned, and operated by the Turkish government, has been seized under process issued out of the United States District Court for the Southern District of New York.

"I have received cabled instructions from his majesty's government at Madrid, acting at the instance of the Turkish government at Constantinople, to do everything possible in my official capacity as the representative of the Turkish government in the United States, to obtain the vessel's release because she is owned, manned, and operated by the Turkish government. The department would therefore honor me by advising that it recognizes the fact that I am officially in charge of the Turkish governmental interests in the United States during the suspension of diplomatic relations between the two governments, that no declaration of war has been made by either government as against the other, and that the treaties between the two nations are still in force.

"Believe me, my dear Mr. Davis,
"Very sincerely yours."

"Department of State, Washington.

"Washington, D. C., December 24, 1920.

"My Dear Mr. Ambassador: I beg to acknowledge receipt of your note of December 23, 1920, in which you state that the steamship Gul Djemal, which is owned, manned, and operated by the Turkish government, has been seized under process issued out of the United States District Court for the Southern District of New York, and that you have been instructed by his majesty's government at Madrid, acting at the instance of the Ottoman government, to do everything possible to obtain the release of the vessel mentioned. It is understood that you desire a statement that the department recognizes that you are officially in charge of the Turkish governmental interests in the United States

during the suspension of the diplomatic relations between the two governments; that no declaration of war has been made by either government as against the other, and that the treaty between the two countries is still in force. Inasmuch as you have for a considerable period been ambassador recognized by the department as representing Turkish interests in the United States, the department will of course be glad to give consideration to any representation which you desire to make to this government on behalf of the Ottoman government in relation to the detention of the steamship Gul Djemal. Although the diplomatic relations between the government of the United States and the government of Turkey were severed on the initiative of the Turkish government, no declaration of war has, as you doubtless are aware, been made by either government against the other. With respect to the status of the treaties between the United States and Turkey, I beg to say that, in view of the interruption of relations between the two countries, the department prefers to refrain at this time from discussing the status of these treaties.

"I am, my dear Mr. Riano,

"Very sincerely yours,

"To Senor Don Juan Riano, Ambassador of His Majesty, the King of Spain, at Washington."

These letters were brought to my attention, and formed the basis of a rehearing of the original motion. I have given the letters and the arguments made thereon careful consideration, and have concluded that I should adhere to my original decision. In saying this I wish it understood that this court is anxious, within the limits of what it conceives to be its power and discretion, to accord to the Spanish ambassador and to the Ottoman government every courtesy, right, privilege, and immunity to which either may be entitled under the law of nations.

The fact, however, remains that diplomatic relations between the United States and Turkey were severed in 1917, and such relations have not been resumed. I realize, of course, that a breach in diplomatic relations does not bring about a cessation of all intercourse between the states concerned. This is amply established by the letters above quoted and by the invariable line of conduct pursued in like instances throughout many years of history. Nevertheless, I cannot divorce my mind from the firm conviction that, once diplomatic relations are severed, the intercourse thereafter to be carried on between the states should, so far as this government is concerned, be exclusively confined to that department which, under our frame of government, is charged with the management of foreign affairs. My investigations of international law lead to the conclusion that a severance of diplomatic relations is a nonamicable measure, and there is a possibility that at any time one government or the other may engage in various methods of retortion or retaliation without state of war resulting therefrom. For example, a pacific blockade or an embargo may be declared, and possibly other action taken that is in its essence political rather than legal. If, in a given case, it were the desire of this government to take advantage of any such measure, this court would not be informed of the fact, and in so far as the court attempted to deal with property which might be the subject-matter of executive action, it would run the risk of completely frustrating the same.

It is doubtless true, as is represented to me, that there exists between Turkey and the United States, notwithstanding the severance of diplomatic relations, a considerable degree of cordiality. Indeed, so far as I

am informed, there is no reason why, from a governmental standpoint, the Gul Djemal should not be declared immune from process. This view, however, so far as it affects this court, is a matter of belief that falls short of knowledge. If the amity existing between the two states is such that this government wishes the vessel released, I will gladly release her, upon a suggestion that emanates from the Department of State.

The adoption of a suggestion short of one originating in such department carries with it, I think (at least under circumstances differing from those now present), the possibility not only of confusion between co-ordinate branches of this government, but also the likelihood of embarrassment. If, in cases where diplomatic relations have been severed, such matters are left to the exclusive management of the executive, all such danger will be avoided.

The views I entertain upon the subject would seem to have some support in the statutory law of the United States. Section 202 of the Revised Statutes (Comp. St. § 300) reads:

"The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs as the President of the United States shall assign to the department, and he shall conduct the business of the department in such manner as the President shall direct."

This statute to my mind indicates that the action I am asked to take here, in the absence of a suggestion from the State Department, is not within the purview of my authority. Indeed, the letter of the Acting Secretary of State, above quoted, shows that that department will gladly consider any representations that the Spanish ambassador wishes to make with reference to the Gul Djemal. I quote:

"Inasmuch as you have for a considerable period been ambassador recognized by the department as representing Turkish interests in the United States the Department will of course be glad to give consideration to any representation which you desire to make to this government on behalf of the Ottoman government in relation to the detention of the steamship Gul Djemal."

The question being one pre-eminently, and I think exclusively, within the province of the State Department, I accordingly decline to release the ship, save upon a suggestion that emanates from that department.