## THE GUL DJEMAL.

(District Court, S. D. New York. January 7, 1922.)

**International law ⊚⇒10—Ship owned by foreign government but under charter for ordinary commerce, not immune from arrest.**

A steamship owned and operated by the Turkish government, and engaged in commercial trade under charter to an individual, *held* not immune from seizure on process, especially as diplomatic relations between

the United States and Turkey had been severed at the time of the seizure, and in the absence of any suggestion for immunity from the State Department.

In Admiralty. Libel by Campbell & Stuart, Inc., against the steamship Gul Djemal, her engines, boilers, etc. Decree for libelant.

Decree affirmed, 263 U. S. ——, 44 Sup. Ct. 244, 68 L. Ed. ——. See, also, 296 Fed. 563.

Barker, Donahue, Anderson & Wylie, of New York City (Harrington, Bigham & Englar, of New York City, of counsel), for libelant.

Purrington & McConnell, of New York City, for claimant.

KNOX, District Judge. Since this litigation was before me, the proctors for the respective parties have entered into a stipulation of facts, of which the following two paragraphs are a part:

"Third. That at all the times mentioned in the libel herein, and at the time of the arrest of the Gul Djemal, the Gul Djemal was engaged in commercial trade, under charter for one round voyage to George Dedeoglou, who engaged to carry passengers and goods for hire, and in such trade the Gul Djemal was not functioning in a naval or military capacity, nor was there anything of a naval or military character connected with the voyage of the Gul Djemal from Constantinople to New York and return.

"Fourth. That the Turkish government [which owned the Gul Djemal and had on board a master, officers, and crew employed by or under direction of Seire-Seffain Administration, and paid by the Treasury Department of the Turkish government through the Administration Seire-Seffain, a branch of the Ministry of Marine], prior to the time mentioned in the libel herein, had severed diplomatic relations with the United States of America, advising its peoples by proclamation, however, that American institutions should not be molested, but should be treated as theretofore; that said diplomatic relations have not been resumed, although the United States of America maintains unofficial relations with the Turkish government by American consular representatives, and through the medium of a high commissioner; that during said period of the severed relations the Spanish ambassador to the United States has represented, and still represents, Turkish interests in the United States, and has been recognized as such representative by the Department of State of the United States of America."

Upon the facts so stipulated I now definitely hold that the Gul Djemal was not immune from seizure upon process issued at the instance of libelant. Were I to follow my own inclination, I should not amplify this declaration, and would sign the interlocutory decree submitted by libelant. Proctors for claimant, however, have requested that I give some further expression of my reasons for holding the vessel. Being perhaps under some obligation to furnish counsel with a target at which to direct their fire in the appellate court, I shall briefly comply with their request. In so doing I am greatly aided by the able opinion filed by Judge Mack in Luzzato & Sons v. The Pesaro (D. C.) 277 Fed. 473 upon October 1, 1921. Judge Mack there said:

"If, as I believe, sound principles of admiralty jurisprudence require that a ship be treated as an entity separate and distinct from her owner, the immunity of a public ship should depend primarily, not upon her ownership, but upon the nature of the service in which she is engaged, and the purpose for which she is employed. That is a distinction or standard towards which Bynkershoek, Marshall, and Stowell tended, and in favor of which there is not only the specific authority of Story and Phillimore, but the force of judicial analogy and the requirements of modern economic life."

Further on in the opinion it was said:

"To deprive parties injured in the ordinary course of trade of their common and well-established legal remedies would not only work great hardship on them, but in the long run it would operate to the disadvantage and detriment of those in whose favor the immunity might be granted. Shippers would hesitate to trade with government ships, and salvors would run few risks to save the property of friendly sovereigns, if they were denied recourse to our own courts and left to prosecute their claims in foreign tribunals in distant lands."

There is little or nothing that I can add to what has been quoted, and which, to me, is quite sufficient for the purposes of the present decree. I will, however, observe that in my judgment a government which makes it possible, as here, for an individual, who is hedged about with no special immunities or prerogatives, to use sovereign property for purposes of trade and commerce, and in competition with that of private owners, has brought itself squarely within the declaration of the Supreme Court in Bank of U. S. v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244, where it was said:

"It is, we think, a sound principle that, when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted."

The existing immunities and prerogatives of governments are all but too extensive, and the one here claimed should not be permitted to destroy, as it would, the basic principle that in trade and commerce there should be for the persons engaged therein a fair field and no favors. So much for the facts disclosed by paragraph "Third" of the stipulation.

But, irrespective of what has already been said, I am of opinion that at the time of the seizure of the Gul Djemal she enjoyed no immunity from such restraint, inasmuch as diplomatic relations between the United States and Turkey were then severed, and that therefore the comity and courtesy due from this country to Turkey did not, in the absence of appropriate suggestion from the State Department of this government, require the extension of such immunity. As for my reasons for so holding, I do not care to augment what I have previously said upon the subject in my memorandum of January 3, 1921. 296 Fed. 563.

Decree for libelant signed.