LASZLO TELKES, Respondent, v. HUNGARIAN NATIONAL MUSEUM by MARTIN KASTENGREN, Royal Consul General of Sweden, in Charge of Hungarian Interests in the State of New York, on Behalf of the HUNGARIAN NATIONAL MUSEUM and the KINGDOM OF HUNGARY, Appearing Specially Herein, Appellant.

First Department, December 11, 1942.

*Samuel Leavitt* of counsel (*Arpad A. Kremer* with him on the brief; *Kremer & Leavitt,* attorneys), for appellant, appearing specially.

*Abraham Rotwein* for respondent.

CALLAHAN, J. Plaintiff commenced this action against the Hungarian National Museum by service of a summons by publication after issuance of and levy under a warrant of attachment.

The action is for moneys alleged to be due under a contract of employment. Plaintiff, a citizen of the United States, asserts that defendant is a foreign corporation organized under the laws of Hungary. He claims that in 1937 defendant made a contract with him whereby he was employed as director of the Hungarian Reference Library, conducted in New York, by defendant. His complaint alleges three causes of action: (1) for moneys due under the labor laws of Hungary, which plaintiff says, by agreement of the parties, were to govern his contract; (2) for salary earned, and (3) for moneys advanced by plaintiff for defendant.

The Royal Consul General of Sweden in New York has appeared specially and moved to vacate the levy under the attachment, and to dismiss the complaint, on the ground that the defendant is an agency or instrumentality of the Kingdom of Hungary, and, thus, immune from suit or from attachment of its property. The Swedish Minister to the United States has designated the Royal Consul General to bring this proceeding.

It appears from the record, that our Department of State has recognized the authority of the Swedish Minister to act as representative of Hungarian interests in the United States, because of the existence of a state of war between the United States and Hungary. However, the State Department has made no suggestion to the court concerning the claim of immunity involved herein.

A sharply contested issue of fact was raised by the affidavits and exhibits submitted by both sides on the motion to vacate, the movant claiming that defendant was an agency or instrumentality of the Kingdom of Hungary, and the plaintiff claiming that it was an autonomous foreign corporation organized under the laws of Hungary.

Ordinarily such an issue should be sent to a referee to hear and report, and not be decided on affidavits. (*Hannes* v. *Kingdom of Roumania Monopolies Institute,* 260 App. Div. 189.) While a reference may be dispensed with when the court finds no diffi-

culty in ascertaining the true facts from the papers, the disposition made here, resolving the facts in plaintiff's favor on the affidavits, was unwarranted on the present record.

Plaintiff asserts, however, that, even if the defendant is an agency of the Kingdom of Hungary, no claim of immunity can be made on its behalf, because a state of war exists between Hungary and the United States. The movant contends, on the other hand, that, if defendant is in fact an agency or instrumentality of the Hungarian Government, it may not be sued in the courts of this State, and that no exception is to be made to this rule because our Government is at war with Hungary.

No controlling authority has been cited to us as to the effect of the existence of a state of war on the right to claim sovereign immunity. We find, however, that a somewhat analogous question was presented in the case of *Wulfsohn* v. *Russian Republic* (234 N. Y. 372). There an action was brought against the Russian Socialist Federated Soviet Republic prior to the time when the new Russian Government was recognized by our Government. The action was in tort and based on acts committed within the territorial limits of Russia. Jurisdiction was obtained by attachment of property located here. Our Court of Appeals ruled that the attachment should be vacated, and the action dismissed, for the reason that a suit might not be maintained against the Soviet Government, even though that country was not recognized by the United States. In its opinion the court said (p. 375): " We have an existing government sovereign within its own territories. * * * They may not bring a foreign sovereign before our bar, not because of comity, but because he has not submitted himself to our laws. Without his consent he is not subject to them. Concededly that is so as to a foreign government that has received recognition." (Citing cases.) But whether recognized or not the evil of such an attempt would be the same. * * * Such is not the proper method of redress if a citizen of the United States is wronged. The question is a political one, not confided to the courts but to another department of government. * * *."

In *Russian Republic* v. *Cibrario* (235 N. Y. 255), an action was sought to be maintained in our courts by a foreign government as plaintiff prior to the time when recognition had been extended to it. The Court of Appeals pointed out that the right of a foreign sovereign to resort to our courts as a litigant in its own behalf was granted as a matter of comity; that, in the absence of recognition, no comity existed. It, therefore, held that the suit might not be maintained because of the absence of

recognition. The court referred to its prior decision in the *Wulfsohn* case (*supra*), saying (at p. 263): "If it were [an existing government], as was alleged and admitted, the same result followed not because of comity, but because an independent government is not answerable for its acts to our courts."

In *Nankivel* v. *Omsk All Russian Government* (237 N. Y. 150), an action was sought to be maintained against the Omsk All Russian Government which had existed for a time as a *de facto* government in a portion of what is now Russia. The Omsk Government had been extinguished by conquest before suit was commenced. It had never been recognized by the United States. The Court of Appeals held that the suit could not be maintained, stating: "So long as it maintained an independent existence, it was immune from suit for its governmental acts in our courts without its consent. Lack of recognition by the United States government, we have recently held, does not permit an individual suitor to bring a *de facto* government before the bar. (*Wulfsohn* v. *Russian S. F. S. Republic*, 234 N. Y. 372.)"

In *Lamont* v. *Travelers Ins. Co.* (281 N. Y. 362, at p. 367), the court said: "The courts of this State cannot adjudicate any controversy to which a foreign sovereign government is a necessary party unless the foreign government, as a suitor, asks our courts to enforce some right claimed by the foreign government or, voluntarily, submits to our courts for adjudication a claim which another makes against it." And, at page 369, the court further said: "A foreign government, like the government of a State or of the United States, cannot be called to account in the courts of this State. Redress for repudiation even of a solemn contract or for injury inflicted without any justification by a sovereign State cannot be granted by the courts without the consent of the sovereign State."

In *De Simone* v. *Transportes Maritimos Do Estado* (200 App. Div. 82, 85), this court cited with approval statements found in Federal cases concerning the rule governing immunity, as follows: "* * * In *United States* v. *Diekelman* (92 U. S. 520, 524) the court said: 'One nation treats with the citizens of another only through their government. A sovereign cannot be sued in his own courts without his consent. His own dignity, as well as the dignity of the nation he represents, prevents his appearance to answer a suit against him in the courts of another sovereignty, except in performance of his obligations, by treaty or otherwise, voluntarily assumed. Hence, a citizen of one nation wronged by the conduct of another nation, must seek

redress through his own government. His sovereign must assume the responsibility of presenting his claim, or it need not be considered. If this responsibility is assumed, the claim may be prosecuted as one nation proceeds against another, not by suit in the courts, as of right, but by diplomacy, or, if need be, by war. It rests with the sovereign against whom the demand is made to determine for himself what he will do in respect to it. He may pay or reject it; he may submit to arbitration, open his own courts to suit, or consent to be tried in the courts of another nation. All depends upon himself.' Alexander Hamilton wrote: ' It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense, and the general practice of mankind.' (The Federalist, No. LXXXI.) ''

From these cases it would appear that, as viewed by the courts of this State, the rule forbidding suit against a foreign sovereign without his consent does not rest on comity, but is applied because such suits involve claims of a political nature which are not entrusted to the municipal courts. Based on the reasoning that the immunity from suit is not a matter of comity, our courts hold that lack of diplomatic recognition does not affect the immunity. We see no difference in principle between a case where recognition is lacking and a case where we are at war with a sovereign. The latter case merely affords greater reason for refusing to exercise comity.

Plaintiff has called our attention to the decision in *The Gul Djemal* (296 Fed. 563; 296 Fed. 567). There the District Court refused to receive a plea of sovereign immunity presented by alleged representatives of a foreign sovereign power, because diplomatic relations had been severed with that power. The decision was based on the application of the rule of comity which, as we have heretofore indicated, the courts of this State have held is not controlling. It is to be noted, further, that the proceeding was *in rem* and not *in personam*.

The litigation involved in *The Gul Djem*₄₄ (*supra*) case, twice reached the United States Supreme Court. *First,* a writ of prohibition was sought to be obtained attacking the jurisdiction of the District Court. The Supreme Court denied the motion for the writ, on the ground that jurisdiction was doubtful, saying that the question was new and difficult, and should not be decided on petition for prohibition (*Ex parte Hussein Lutfi Bey*, 256 U. S. 616). Later, when the District Court had denied the claim of immunity on the merits, a second review was had on the appeal then taken. The United States Supreme Court thereupon affirmed the decision of the District Court, solely, however, on

the ground that the claim had been advanced by one who was not authorized to vindicate the sovereign's right to immunity (*The Gul Djemal*, 264 U. S. 90). No decision by the United States Supreme Court, passing on the question involved here, has been called to our attention.

If movant's claim that Hungarian National Museum is merely a department of the Hungarian Government, is correct, then plaintiff, in effect, is seeking in this action to recover from a foreign sovereign his compensation as a public officer of that sovereign. We conclude that, in such an action, brought *in personam* or *quasi in rem,* a sovereign may not be sued in our courts, or have his property attached here. Existence of a state of war would not seem to alter this rule.

The present case is not analogous to one where a private corporation is sued and claims that the suit is a burden on commerce. (See *Matter of Banque de France* v. *Supreme Court,* 287 N. Y. 483.) In such a case, considerations of public policy might arise, and effect be given to the practical difficulties that citizens of this State would face if they were relegated to courts of unfriendly countries.

Undoubtedly, when war was declared, our Government might have seized the property of Hungarian Reference Library in this country. Under such circumstances, plaintiff could have enforced his rights against the Alien Property Custodian, under the Trading with Enemy Act (U. S. Code, tit. 50, Appendix § 9). But in such a suit the foreign sovereign would not be a necessary party (*White* v. *Mechanics Securities Corp.*, 269 U. S. 283). Apparently our Government did not see fit to take the Hungarian library into custody, but merely notified the Royal Swedish Minister to take charge of it. This much appears from the record, and, in addition, it appears that, in giving this notice, the Secretary of State announced that the library was an agency of the Kingdom of Hungary; that it had been represented to be such by the plaintiff, its director, who was recognized by our Government as an official of the Hungarian Government. Plaintiff had been exempted from income taxes as such an official. The Swedish Minister was requested by our Secretary of State to close the library and remove the plaintiff as director. It was after action, in conformity with that request, was taken by the Swedish Minister that the plaintiff commenced the present suit.

If defendant is an autonomous, corporate body, subject to suit, this action is maintainable; but if, on the other hand, the defendant is an agency or instrumentality of the Hungarian

Government exercising a governmental function, this suit is not maintainable.

The issue as to defendant's status should be sent to an official referee of this court to take testimony and report to Special Term, which will then take proper action in the premises.

The order appealed from should be modified accordingly, and as so modified affirmed without costs.

MARTIN, P. J., TOWNLEY, GLENNON and COHN, JJ., concur.

Order unanimously modified in accordance with opinion, and as so modified affirmed, without costs. Settle order on notice.